**Bettina J. SCHUETZ, Plaintiff–Appellant,**

v.

**BANC ONE MORTGAGE CORPORATION, Defendant–Appellee.**

No. 01–16206.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 11, 2002.

Filed June 10, 2002.

Barry G. Reed, Zimmerman Reed, P.L.L.P., Scottsdale, AZ, for the plaintiff-appellant.

Alan H. Maclin, Briggs and Morgan, P.A., St. Paul, MN, for the defendant-appellee.

Before RYMER, KLEINFELD and McKEOWN, Circuit Judges.

## OPINION

RYMER, Circuit Judge.

This appeal requires us to decide whether yield spread premiums, which are fees paid by mortgage lenders to mortgage brokers that are based on the difference between the interest rate at which the broker originates the loan and the par, or market rate offered by the lender, are lawful under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 et seq. (West 2001). RESPA prohibits the giving or receiving of fees for referral as part of a real estate settlement service but permits fees that are paid for

facilities actually furnished or services actually performed in the making of a loan. RESPA, § 8(a), (c)(2); 12 U.S.C. § 2607(a), (c)(2).

Bettina J. Scheutz obtained a federally related mortgage loan from Banc One Mortgage Corporation through a mortgage broker, Home Mortgage Financial Corporation. She paid Home Mortgage direct fees and Banc One paid it a yield spread premium. She brought a class action challenging the yield spread premium payment as contrary to § 8(a).

We do not write on a clean slate in deciding whether the yield spread premium was a referral, because the Department of Housing and Urban Development (HUD), which is charged with enforcing RESPA, has prescribed a test for determining the propriety of a yield spread premium payment. It asks whether services were actually performed for the total compensation paid to the mortgage broker, and whether that compensation is reasonably related to the services provided. The district court deferred to this test, correctly we believe, and declined to certify a class of borrowers for lack of a common question of fact. It then granted summary judgment in favor of Banc One on Scheutz's claim that its payment of the yield spread premium was really for a referral of business by Home Mortgage. The court concluded that the broker performed services that contributed to the transaction, and that Home Mortgage's total compensation (of which the yield spread premium was a part) was reasonably related to the services provided. We agree with these rulings.

As we have jurisdiction, 28 U.S.C. § 1291, we affirm.

I

When Schuetz found a house that she wanted to buy in the Sun Lakes Country Club development in Sun Lakes, Arizona, she hired Home Mortgage Financial Corporation, a mortgage broker, to arrange a loan. Mortgage brokers are intermediaries who bring borrower and lender together. Borrowers typically approach the mortgage settlement process with a variety of individual characteristics and needs, including their credit rating, income, sensitivity to interest rate variations, and preference for paying charges up front or spreading them out in the form of a higher interest rate. Brokers furnish numerous services to consumers;[1] in Schuetz's case,

---

1. These services were first catalogued in a HUD letter to the Independent Bankers Association of America, dated February 14, 1995, and were listed again in HUD's Statement of Policy 1999–1. They include:

(a) Taking information from the borrower and filling out the application;

(b) Analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

(c) Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

(d) Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e) Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f) Initiating/ordering requests for mortgage and other loan verifications;

(g) Initiating/ordering appraisals;

(h) Initiating/ordering inspections or engineering reports;

(i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j) Assisting the borrower in understanding and clearing credit problems;

(k) Maintaining regular contact with the borrower, realtors, lender, between application and closing ... and gather any additional needed information ...;

(l) Ordering legal documents;

Home Mortgage analyzed her income and debt, explained the loan process and loan products available to her, collected her financial information, obtained a credit report on her behalf, secured an appraisal, prepared her loan package, and submitted it to Banc One. Mortgage brokers are compensated in several ways for their services. Compensation from the borrower to the broker is a direct fee, while money that the borrower pays the lender and the lender pays the broker is an indirect fee. Because lending institutions such as Banc One offer intermediaries options in structuring their compensation, brokers in effect determine their own compensation for any particular transaction by choosing the combination of loan characteristics and prices to offer a consumer.

A broker selects a loan product from among the various loans offered by the lending institutions with which it maintains a relationship. According to Home Mortgage, loans are selected based on the lender's service, turnaround time, ability to make the required funds available, reputation in the community, level of professionalism, reputation with the banking department, competitive rates, underwriting flexibility, and the availability of products.

Home Mortgage obtained Schuetz a 30-year loan in the principal amount of $68,000 with a 7.5% interest rate from Banc One, which is a wholesale lender. This was above Banc One's par rate. "Par rate" refers to the rate at which the lender will fund 100% of a loan with no premiums or discounts to the broker. For each loan product, Banc One estimates the secondary market value of a model loan and derives a "par" price (taking into account its own costs and return requirements)

(m) Determining whether the property was located in a flood zone ...; and
(n) Participating in the loan closing.
Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding

that it uses in developing rate sheets for brokers. If the interest rate on a particular loan exceeds the rate assumed by Banc One's par price model, Banc One will pay the broker a "yield spread premium" equal to the value of the additional interest.

A yield spread premium, or "YSP," is a lump sum paid by a lender to a broker at closing when the loan originated by the broker bears an above-par interest rate. As HUD has explained it:

Payments to brokers by lenders, characterized as yield spread premiums, are based on the interest rate and points of the loan entered into as compared to the par rate offered by the lender to the mortgage broker for that particular loan (e.g., a loan of 8% and no points where the par rate is 7.50% will command a greater premium for the broker than a loan with a par rate of 7.75% and no points). In determining the price of a loan, mortgage brokers rely on rate quotes issued by lenders, sometimes several times a day. When a lender agrees to purchase a loan from a broker, the broker receives the then applicable pricing for the loan based on the difference between the rate reflected in the rate quote and the rate of the loan entered into by the borrower....

Lender payments to mortgage brokers may reduce the up-front costs to consumers. This allows consumers to obtain loans without paying direct fees themselves. Where a broker is not compensated by the consumer through a direct fee, or is partially compensated through a direct fee, the interest rate of the loan is increased to compensate the broker or the fee is added to principal.

Lender Payments to Mortgage Brokers, 64 Fed.Reg. 10080, 10085 (March 1, 1999) (footnotes omitted).

In any of the compensation methods described, all costs are ultimately paid by the consumer, whether through direct fees or through the interest rate.

1999 Statement of Policy, 64 Fed.Reg. at 10081 (footnotes omitted).

In this case, Schuetz paid her broker direct fees of $1,661.00, consisting of $688.00 for loan origination, $688.00 for loan discount, and $285.00 for processing. Banc One also paid Home Mortgage a yield spread premium of $516.00. This payment was identified on Schuetz's HUD–1 Settlement Statement as "Mortgage Broker fee to Home Mortgage from BANC ONE."[2]

Scheutz sued Banc One on behalf of a class of borrowers whose loan settlements included a yield spread premium payment, claiming that the YSP violates RESPA because it is a kickback for referral of a federally related mortgage loan.[3] She sought class certification, which the district court denied. It concluded that the issue on which this litigation would turn is whether the yield spread premiums paid by Banc One are compensation for facilities or services actually performed, and decided that this issue was too fact intensive to be resolved on a class-wide basis. We declined to take an interlocutory appeal from the order denying certification.

Cross-motions for summary judgment resulted in judgment for Banc One. The district court held that HUD's 1999 Statement of Policy guided the outcome because Congress authorized HUD to promulgate rules and regulations to implement RESPA, and to interpret the statute. Applying HUD's test for legality of yield spread premium payments, the court found it undisputed that compensable services were performed by Home Mortgage and that they were worth what the broker was paid. Accordingly, the court concluded that no RESPA violation occurred.

Schuetz appeals both orders.

## II

In a nutshell, Schuetz contends that the direct fees which she paid fully compensated Home Mortgage for the services it performed and that the yield spread premium paid by Banc One, which was not tied to— or in exchange for—any particular services, is necessarily a fee for referral. In her view, HUD and the district court got the liability test wrong, and the Eleventh Circuit got it right in *Culpepper v. Irwin Mortgage Corp.*, 253 F.3d 1324 (11th Cir. 2001). Banc One counters that HUD's test is binding and that courts must defer to it.

The backdrop is cumbersome but important.

## A

Congress enacted RESPA in 1974 to protect home buyers from inflated prices in the home purchasing process. It sought to increase the supply of information available to mortgage consumers about the cost of home loans in advance of settlement, and to eliminate abusive practices such as kickbacks, referral fees, and unearned fees. To accomplish the first purpose, the Act requires lenders to provide borrowers with a statement identifying all settlement charges on a standardized form, commonly known as a "HUD–1," 12 U.S.C. § 2603 (West 2001), and with an information booklet prepared by HUD that counsels bor-

---

**2.** A HUD–1 Settlement Statement is a form that lenders must provide to borrowers to identify all settlement (or closing) costs on a federally related mortgage loan. 12 U.S.C. § 2603 (West 2001).

**3.** Other claims for violating federal and state law were dismissed and no appeal is taken as to them. Other parties, both plaintiff and defendant, were also dismissed.

rowers on how mortgage transactions work and how to recognize inflated charges. *Id.* at § 2604.

Sections 8(a) and 8(c)(2) are the provisions primarily at issue in this case. Section 8(a) prohibits fees for referrals. It provides: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). Section 8(c)(2) provides: "Nothing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed ...." *Id.* § 2607(c)(2).

HUD is the administrative agency charged with enforcing RESPA. It is authorized by statute to prescribe rules and regulations, and to make interpretations of RESPA. 12 U.S.C. § 2617(a). HUD has issued regulations pursuant to this authority. *See* "Regulation X," 24 C.F.R. § 3500.1 *et seq.* Section 3500.14 pertains to kickbacks and unearned fees that are prohibited by § 8 of the statute. This regulation proscribes referral fees, 24 C.F.R. § 3500.14(b),[4] and defines a "referral" as "any oral or written action ...

which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business." *Id.* at § 3500.14(f)(1). The regulations also implement § 8(c)(2) of the Act by providing that "[a] payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed" is permissible. *Id.* at § 3500.14(g)(1)(iv).

Sections 8(a) and (c)(2) of RESPA generated a considerable amount of litigation. In light of the legal uncertainty about lender payments to mortgage brokers for services performed, Congress directed HUD to address the issue within 90 days of October 21, 1998 (the date on which the Department's 1999 appropriations bill was enacted). *See* Conference Report on the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, H.R. Conf. Rep. No. 105–769 (1998), *reprinted in* U.S.C.C.A.N. 539, 568.

Meanwhile, the Eleventh Circuit Court of Appeals rendered its first opinion in the *Culpepper* litigation. *Culpepper v. Inland*

---

4. Section 3500.14(b) provides:

No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 3500.14(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

24 C.F.R. § 3500.14(b). Subsection (e) further provides:

An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business. *Id.* at § 3500.14(e).

*Mortgage Corp. (Culpepper I),* 132 F.3d 692 (11th Cir.1998). The Culpeppers had obtained a federally insured home mortgage from Inland Mortgage Corporation through their mortgage broker at an interest rate of 7.5%. Unbeknownst to them, this was over Inland's par rate and carried a yield spread premium of $1,263.61 even though Inland would have made the same loan at 7.25% with a YSP of only $97.20. They challenged the yield spread premium on the footing that it was not tied to services but to the size and interest rate of their loan. The court agreed that the only service for which the YSP was compensation was the "service" of referring an above par loan to the lender, which RESPA does not permit.[5]

HUD issued a Statement of Policy March 1, 1999 after consulting industry groups, federal agencies, consumer groups and other interested parties. 1999 Statement of Policy, 64 Fed.Reg. at 10084. The heart of HUD's position is that lender payments to mortgage brokers are not illegal per se; yield spread premium payments may be legal (or illegal) in individual cases or classes of transactions. *Id.* Accordingly, the Policy Statement prescribes the following test:

> In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were

actually furnished or services that were actually performed.

> In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. The Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed. HUD believes that total compensation should be carefully considered in relation to price structures and practices in similar transactions and in similar markets.

*Id.*

After HUD's 1999 Policy Statement was issued, Inland (by then known as Irwin) appealed certification of a class of borrowers on whose loans it had paid a yield spread premium to the mortgage broker. *Culpepper v. Irwin Mortgage Corp. (Culpepper III),* 253 F.3d 1324 (11th Cir.2001). Irwin argued that the Policy Statement overruled *Culpepper I's* interpretation of § 8(a). The court rejected that argument, as well as the lender's contention that the legality of a YSP payment could only be determined loan transaction by loan transaction. It held that the test for § 8 liability is not whether the broker performed *some* services, but whether the YSP is payment *for* those services. Otherwise,

---

5. The court denied Inland's petition for rehearing in a published opinion. *Culpepper v.*

*Inland Mortgage Corp. (Culpepper II),* 144 F.3d 717 (11th Cir.1998).

the Policy Statement's requirement that payment be "for compensation paid" would not be met; the result would be inconsistent with § 8(c) because the preposition "for" connotes an exchange and the word "fee" implies a money-services exchange to be within § 8(c); and it would permit payments under the guise of § 8(c) that § 8(a) plainly prohibits.

HUD then issued another Statement of Policy "to eliminate any ambiguity concerning the Department's position with respect to those lender payments to mortgage brokers characterized as yield spread premiums ... as a result of questions raised by ... Culpepper v. Irwin Mortgage Corp." Real Estate Settlement Procedures Act Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed. Reg. 53052 (October 18, 2001). The 2001 Statement explicitly rejects *Culpepper's* interpretation, and reiterates the position taken in the 1999 Statement—that yield spread premiums are not per se legal or illegal and that this turns on meeting the requirements of its two-prong test.

The 2001 Statement indicates that under the first prong, "it is necessary to look at each transaction individually, including examining all of the goods or facilities provided or services performed by the broker in the transaction, whether the goods, facilities or services are paid for by the borrower, the lender, or partly by both." *Id.* at 53055. It further states that a yield spread premium may not be presumed to be a referral fee based solely on the fact that the lender makes such a payment to a broker. *Id.* The 2001 Statement notes that yield spread premiums are by definition derived from the interest rate and that this, by itself, does not indicate whether a particular YSP is a payment for facilities actually furnished or services actually performed. *Id.* HUD also makes clear that the first part of its test does not contemplate identifying or allocating which facilities, goods or services are performed for the lender or for the borrower as all of them inure to the benefit of both. *Id.* In addition, the 2001 Statement advises that the list of services provided in the 1999 Statement, while not exhaustive, is still accurate, and that compensation for them may be paid either by the borrower or the lender or partly by both. However, "[c]ompensable services for the first part of the test do not include referrals or no, nominal, or duplicative work." *Id.*

The 2001 Statement essentially repeats the considerations that HUD set out in the 1999 Statement for resolving the second, or reasonableness, part of the test. In sum, the pivotal question is whether a mortgage broker's total compensation is reasonable. Total compensation includes fees paid by a borrower and any yield spread premium paid by a lender, not simply the yield spread premium alone. *Id.* Total compensation to the broker must be reasonably related to the total value of goods or facilities provided or services performed; "simply delivering a loan with a higher interest rate is not a compensable service." *Id.* And payments must be commensurate with the amount normally charged for similar services in similar transactions in similar markets. *Id.*

Finally, by way of background, the district court in this case rejected *Culpepper's* interpretation and granted *Chevron*-style deference to HUD's 1999 Policy Statement. The 2001 clarification was not issued until after briefing had begun on appeal. However, we have heard from both parties on its impact and turn now to their arguments.

### B

Schuetz urges us not to defer for a number of reasons. As she sees it, HUD's

liability test permits what the statute prohibits by necessarily including the illegal referral fee in the "reasonableness of total compensation" analysis. In addition, the HUD test was adopted without "notice and comment" rulemaking, and a mere policy statement cannot have the same force and effect. Beyond this, in Schuetz's view, HUD rewrote § 8(c)(2) by eliminating the words "for" and "actually" ("for goods or facilities actually furnished or for services actually performed") in clarifying that total compensation should be "reasonably related to the goods, facilities or services furnished or performed." She posits that this also makes the 2001 Statement inconsistent with the regulations, the 1999 Statement, and with opinion letters sent by HUD's general counsel in 2000 to Congressman Bruce Vento and Senator Richard Shelby which indicated that the facilities or services must have been performed in exchange for compensation paid to the broker. Similarly, Schuetz submits, HUD's clarification is internally inconsistent in its application of § 8(c)(2)'s language in that for purposes of § 8(a) it adopts a "total compensation/reasonableness" test but requires a quid pro quo showing for purposes of § 8(b)'s prohibition on splitting fees. 2001 Policy Statement, 66 Fed.Reg. at 53054–55. Finally, she maintains that HUD lacked authority to correct the Eleventh Circuit's interpretation of a federal statute that is, in any event, not ambiguous.

■ We are not persuaded. First, *Chevron* deference is due even though HUD's Policy Statements are not the result of formal rulemaking or adjudication. "[T]he fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due." *Barnhart v. Walton*, — U.S. —, 122 S.Ct. 1265, 1271–72, 152 L.Ed.2d 330 (2002); *United States v. Mead*

*Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 2173, 150 L.Ed.2d 292 (2001) ("[T]he want of that [notice-and-comment] procedure … does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded."). Here, RESPA authorizes HUD to interpret the statute, 12 U.S.C. § 2617(a), and HUD's regulations indicate that a "statement of policy" published in the Federal Register constitutes "a rule, regulation or interpretation" for purposes of RESPA. 24 C.F.R. § 3500.4(a)(1)(ii). Both policy statements are published in the Federal Register. Nothing suggests that the more formal process of notice and comment was short-circuited for any reason other than Congress's directive to issue the 1999 Statement of Policy within 90 days. Indeed, both policy statements comport with Congressional intent to provide a safe harbor for good faith compliance with HUD rules, regulations, and interpretations. 12 U.S.C. § 2617(a), (b). Schuetz relies on *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), in which an informal opinion letter failed to pass muster, but HUD's policy statements are different because Congress authorized the Department to interpret RESPA, HUD has responsibility for enforcing the statute, and it has expertise in the home mortgage lending industry. *See Barnhart*, — U.S. —, at —, 122 S.Ct. 1265, 1271–72, 152 L.Ed.2d 330, —.

■ We must first determine whether the language of § 8(c)(2) "unambiguously forbids [HUD's] interpretation." *Barnhart*, — U.S. —, at —, 122 S.Ct. 1265, 1269–70, 152 L.Ed.2d 330. It does not. Schuetz's argument is premised on the assumption that "payment for" can only be interpreted as protecting pay-

ments *offered in exchange* for" services rendered. This language, however, is equally capable of supporting HUD's 2001 interpretation, which would read § 8(c)(2) as protecting payments "used as compensation for" services performed. Therefore, we turn to the question of "whether the interpretation for other reasons, exceeds the bounds of the permissible." *Id.* Whether or not HUD's interpretation. is preferable, we cannot say that it is impermissible. The Eighth Circuit has recently so held, and we agree with its reasoning. *Glover v. Standard Federal Bank,* 2002 WL 432992, 283 F.3d 953 (8th Cir. March 21, 2002).[6]

■ The HUD test focuses on whether compensable services of the sort identified in the 1999 Statement are provided, and if they are, then on whether the total compensation (without regard to whether it comes from the borrower, the lender, or both) is reasonably related to the services provided. This is consistent with the general intent of Congress in enacting RESPA, which 'is to foster home ownership. By allowing lenders to pay mortgage brokers yield spread premiums, prospective homeowners with a dearth of cash at the time of settlement can front less money and pay for some of their mortgage broker's services over time. Nor is HUD's test inconsistent with the prohibition on fees for referral; § 8 can reasonably be construed as only prohibiting payments that are for nothing else than the referral

of. business. HUD's test prevents this, too, for the first prong requires actual performance of compensable services. By the same token, the second prong requires that the total compensation, including the YSP if it is a component, be in the ball park. If it isn't, then regardless of whether there is a YSP or the YSP is high or low, an illegal referral may be inferred.

Neither is the 2001 Statement inconsistent with HUD's prior communications. It carries forward the same principles articulated in the 1999 Statement, and we do not read the 2001 Statement as backing off the 1999 position that services must still actually have been performed for the compensation paid. Likewise, we do not see any conflict between the regulations and the Policy Statement. Schuetz contends that § 3500.14(e), which describes how an "agreement or understanding" for referral of business can be proved, adopts a different test for proving liability, but we do not agree. That section pertains to one element of § 8(a) but does not say anything about § 8(c)(2) or its intersection with § 8(a). Similarly, no fatal inconsistency exists on account of two informal letters that HUD's general counsel sent to members of Congress; regardless of how their language may be construed, they are not binding (nor may they be relied upon) in any event. *See* 24 C.F.R. § 3500.4(a)(1); *Smiley v. Citibank,* 517 U.S. 735, 743, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996).

---

**6.** As the court explained:

HUD's two-part test is fully consistent with RESPA. Reviewing services performed and their value on a case-by-case basis does not run afoul of the proscription stated in Section 8(a) prohibiting payments for referrals. Nor does it mean that you retroactively purify unlawful referral fees by offsetting their existence against the performance of legitimate settlement services. Indeed, the [plaintiffs'] course effectively writes Section 8(c) out of RESPA. As noted, Section 8(c) clearly anticipates payments to individuals for goods or facilities actually furnished or for services actually performed, and specifically excludes these payments from the Section 8(a) proscription. 12 U.S.C. § 2607(c)(2). Nothing in RESPA prohibits such payments in the mode of a YSP, or in any other particular form, and HUD's test *simply helps determine whether the YSP,* by its existence, use and amount, falls within or without the permissive boundaries of Section 8(c).

*Glover,* 283 F.3d 953, 2002 WL 432992, *9.

HUD's 2001 Statement of Policy is not internally inconsistent by virtue of how it treats the same language in § 8(c) for purposes of § 8(a) and (b). The Statement explains that § 8(b) prohibits any fee "in excess of the reasonable value of goods and services provided or the services actually performed." 66 Fed.Reg. at 53059. Regardless, to the extent that there is any difference in treatment, § 8(a) and (b) contain distinct prohibitions. Section 8(a) relates to referrals and § 8(b) to fee-splitting. Whereas a yield spread premium involves compensation from lender and borrower for loan origination, the charges that § 8(b) addresses involve a single payment split among settlement service providers.

Finally, HUD has not exceeded its area of expertise. Congress asked for its policy on the legality of yield spread premium payments. The 1999 Policy Statement and its clarification in 2001 respond to that query, concern administration of real estate settlement that is clearly within HUD's province, and interpret a complex statute that HUD enforces.

For these reasons, we agree with the district court that deference is due the HUD policy statements.

### C

■ Having resolved that the two-prong test contained in HUD's 2001 Statement of Policy provides the appropriate standard of liability for yield spread premiums under RESPA, we apply that test to Schuetz's case. With respect to the first prong, there is substantial evidence that Schuetz's mortgage broker provided her a host of compensable goods, facilities, and services. There is no evidence to the contrary. Under the second prong, the record demonstrates that Home Financial offered Schuetz the best interest rate it

could based upon her situation, the rates available at the time, and its need to be compensated. It would not have originated her loan only for the direct fees that she personally paid up front. The evidence shows that the broker's total compensation, including direct as well as indirect fees, was consistent with local practice and reasonably related to the value that Home Financial contributed to Schuetz's transaction. Schuetz offered no evidence to the contrary, and none to show that her broker's services weren't worth what it was paid. In these circumstances, the district court correctly concluded that payment of the yield spread premium did not violate § 8.

### III

■ It follows that the district court did not abuse its discretion in denying class certification. Yield spread premiums are not illegal per se, so whether they amount to a prohibited referral in any particular case depends upon the services provided by the broker and the total compensation paid for those services. This necessarily means that individual issues predominate, and that a class action is not superior.

AFFIRMED.

KLEINFELD, Circuit Judge, dissenting:

There's no avoiding a circuit split.[1] I agree with the Eleventh Circuit and respectfully dissent.

The problem with treating the "yield spread premium" as payment for services rendered *to the borrower,* to be evaluated for reasonableness in each individual case, is that the relationship between the amount of the premium and the value of the services is entirely fortuitous. Be-

---

**1.** *Compare Glover v. Standard Federal Bank,* 283 F.3d 953 (8th Cir.2002) with *Culpepper v.* *Irwin Mortgage Corp. (Culpepper III),* 253 F.3d 1324 (2001).

cause the yield spread premium is calculated purely by the extent to which the borrower's interest rate is above par, sometimes it will be what the broker's services are worth, but only by chance. It's like a stopped clock that shows the right time twice a day, but the clock doesn't measure the time, and the yield spread premium doesn't measure the value of services. Indeed, the higher the interest rate the broker's client pays, the bigger the yield spread premium the broker gets. This makes the premium tend to be inversely proportional to the value of the services to the borrower. Whether the amount approximates the value of services for Schuetz or not, she should have been allowed to go forward with her class action, because it is precisely the fortuitousness that makes the yield spread premium violate RESPA.

RESPA prohibits "kickbacks" by lenders to mortgage brokers. I see the phrase "yield spread premium" as an obfuscatory way of avoiding calling a kickback a kickback. A kickback is "a usually secret rebate of part of a purchase price ... to the one who directed or influenced the purchaser to buy from such seller."[2] It is a payment by a third party to an agent to act on behalf of the third party rather than the principal.[3] The home buyer hires a mortgage broker to shop for a good loan for her, but the broker takes $500 from a lender to steer the buyer to the lender, if the buyer can be persuaded to sign a loan with interest above par. This is how the

"yield spread premium" is calculated. The measure has nothing to do with how much work the broker does. Instead, it is based on one thing: how far above par the interest rate is.

Conceivably, the yield spread premium could be good policy to promote home ownership, as HUD[4] and the majority suggest.[5] The theory would be that some home buyers might not be able to get their loans if they have to pay the broker's reasonable fee up front for doing all the work of putting them together with a lender, and the "yield spread premium" lets them roll the fee into the financing and pay it over the term of their mortgage, perhaps twenty or thirty years. But Congress is no more bound by the "law and economics" school than by "Mr. Herbert Spencer's Social Statics."[6]

There are several problems with vindicating the yield spread premium on this theory that the yield spread premium is a means of, in practical economic effect, financing closing costs. One is that Congress didn't enact it. It prohibited kickbacks whether they work out as good economics or not.[7] The second is that the record doesn't support it. No evidence has been shown to us that the yield spread premium offsets foregone closing costs. Schuetz was charged closing costs anyway, and it was not demonstrated that they should have been higher to compensate the broker, or that the yield spread premium capitalized the value of any inadequacy of

**2.** Webster's Third New International Dictionary (1981).

**3.** Restatement (Second) of Agency § 391 (1984).

**4.** *See* Real Estate Settlement Procedures Act Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees under Section 8(b), 66 Fed.Reg. 53052 (Oct. 18, 2001).

**5.** *See* Majority at 1013.

**6.** *See Lochner v. New York,* 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting).

**7.** 12 U.S.C. § 2607(a)("[n]o person shall give and no person shall accept any ... kickback").

the closing costs she paid compared to the value of the broker's services.

Third, Congress may have been right to reject kickbacks as a matter of economics. The yield spread premium doesn't necessarily roll over the amount of the broker's reasonable fee into the loan and capitalize that portion of the fee as the yield spread premium fee paid by the lender to the broker. The HUD test merely requires that the resulting closing costs be "reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed,"[8] but this does not require that the yield spread premium be subtracted from the closing costs, so the borrower may not actually benefit from the increase in her interest rate. Few but the most alert and aggressive borrowers are likely to spot the obscure "yield spread premium" charge on their closing statement, obtain and comprehend an accurate and coherent explanation from the broker's employee of what it means, and leave in a huff if they don't want to pay the extra interest. Both its obscurity of meaning and its relative size, perhaps a few hundred dollars, of closing costs in the thousands, on a five or six figure loan, may give Congress a reason to protect buyers from it.

It is tempting to defer to HUD anyway because of its expertise, but I do not think we can properly defer to HUD's interpretation. First, the yield spread premium is a kickback, and kickbacks are expressly prohibited by the statute, which says that "[n]o person shall give and no person shall accept any ... kickback."[9] That express language cannot be interpreted away. RESPA does create several exceptions to its expansive reach, including the most arguably applicable: an exception for "(1) the payment of a fee ... (C) by a lender to its duly appointed agent for services actually performed in the making of a loan."[10] As discussed above, the yield spread premium has no relation to the services actually performed by the mortgage broker. The yield spread premium is not within RESPA's explicit exceptions.

Congress did give the HUD Secretary the power to exempt:

such other payments or classes of payments or other transfers as are specified in regulations prescribed by the Secretary, after consultation with the Attorney General, the Secretary of Veterans Affairs, the Federal Home Loan Bank Board, the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Secretary of Agriculture.[11]

Thus, when a conference committee[12] told HUD to decide whether yield spread premiums were consistent with RESPA, HUD should have followed the procedure prescribed by the statute. It did not. The interpretations it promulgated were not regulations. Moreover, the Secretary did not consult with the other executive offices, such as the Secretary of Veterans Affairs, with whom the statute required consultation. HUD did not properly exempt yield spread premiums under RESPA.

---

**8.** Real Estate Settlement Procedures Act Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, 64 Fed.Reg. 10080, 10084 (March 1, 1999).

**9.** 12 U.S.C. § 2607(a).

**10.** 12 U.S.C. § 2607(c).

**11.** *Id.*

**12.** *See* Conference Report on the Departments of Veterans Affairs and Housing and Urban Development, and Independent Appropriations Act, 1999, H.R. Conf. Rep. No. 105–769, 105th Cong., 2d Sess. 260 (1998). Where the Majority Opinion says "Congress" told HUD to do this, it refers to this conference committee report, not an act of Congress. *See* Majority at 1009–10.

RESPA also creates a safe harbor. It states that

(a) The Secretary is authorized to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this Act.

(b) No provision of this Act ... shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Secretary or the Attorney General .... [13]

Where a defendant relied on HUD's rule, regulation, or interpretation of RESPA, he or she would not be liable. There is no rule or regulation at issue here. Assuming HUD's 1999 and 2001 interpretations could provide safe harbors for subsequent yield spread premium charges, they could not here, because Schuetz closed on her mortgage and Banc One received its kickback in 1997. Because Banc One could not have relied on the then-nonexistent interpretations, it cannot claim a safe harbor under the statute.

The majority relies on *Barnhart v. Walton*[14] and *United States v. Mead Corp.*[15] for the proposition that "the fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due."[16] However, where the statute is unambiguous, and the intent of Congress is clear, as it is here—"[n]o person shall

give and no person shall accept any ... kickback"[17]—there is no occasion for *Chevron* deference,[18] and we need not reach the question of whether HUD's policy statements are formal enough to merit *Chevron* deference in the absence of notice and comment rulemaking.

---

13. 12 U.S.C. § 2617.

14. —— U.S. ——, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

15. 533 U.S. 218, 121 S.Ct. 2164, 2173, 150 L.Ed.2d 292 (2001).

16. *Barnhart,* —— U.S. at ——, 122 S.Ct. at 1271.

17. 12 U.S.C. § 2607(a).

18. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Barnhart,* —— U.S. at ——, 122 S.Ct. at 1269.