323 F.3d 739
 Jesse LANE, individually and on behalf of others similarly situated, Plaintiff-Appellant,
v.
RESIDENTIAL FUNDING CORPORATION, a Delaware Corporation; Chicago Title Company, a California Corporation; First National Bank of Chicago, a Illinois Corporation, Defendants-Appellees.
Jesse Lane, individually and on behalf of others similarly situated, Plaintiff-Appellee,
v.
Residential Funding Corporation, a Delaware Corporation, Defendant, and
Chicago Title Company, a California Corporation, Defendant-Appellant.
 No. 01-16269.
 No. 01-16798.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 9, 2002.
 Filed March 13, 2003.
 
 James C. Sturdevant (argued) and Karen L. Hindin, The Sturdevant Law Firm, San Francisco, CA, for the plaintiffs-appellants.
 Stephen Stublarec (argued), Latham & Watkins LLP, San Francisco, CA; John M. Grenfell, and Shawn Hanson, Pillsbury, Winthrop LLP, San Francisco, CA, for the defendant-appellee.
 Appeal from the United States District Court for the Northern District of California; Maxine M. Chesney, District Judge, Presiding. D.C. No. CV-96-03331-MMC/JL.
 Before: D.W. NELSON, BEEZER and WARDLAW, Circuit Judges.
 BEEZER, Circuit Judge.
 
 
 1
 Appellant Jesse Lane bought a house from Residential Funding Corp. ("RFC"). RFC also provided the mortgage loan. RFC required Lane to use Appellee Chicago Title Company's ("Chicago Title") title insurance and escrow services. Lane brought this action, alleging that Chicago Title's pricing arrangements with RFC violate the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601-2617. He contends that certain discounts are prohibited kickbacks, which reward RFC for referring business to Chicago Title.
 
 
 2
 The district court granted Chicago Title's motion for summary judgment. Lane now appeals the judgment against him. Chicago Title cross-appeals the district court's decision refusing to award Chicago Title attorneys fees. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 
 3
 * In September 1995, Jessie Lane purchased a single-family residence in Oakland, California from RFC. RFC also provided a mortgage loan secured by a lien on the real property. As a condition of sale, RFC required Lane to use Chicago Title's escrow and title insurance services. Lane asked to use another company, but RFC refused and would not proceed with the sale unless Lane agreed to use Chicago Title for escrow and title insurance services.
 
 
 4
 Lane accepted RFC's condition and bought the house. He asked Chicago Title about its fees for escrow services and was told that his fees would total $600. This price quote was wrong, however, as it was based on a custom in another part of the state, where buyers and sellers usually split escrow fee costs. Under Lane's contract he agreed to pay all escrow fees. Presumably, Lane's fees should have been $1200 without the split, but at closing the final cost for escrow fees was actually $900.
 
 
 5
 The reason the escrow fees were not $1200 is the focus of this dispute. RFC is a repeat user of escrow and title insurance services.[1] As a result, it has negotiated flat or reduced prices with several escrow providers. RFC's standing agreement with Chicago Title provides that RFC will receive title insurance for 60% of Chicago Title's standard price and RFC's cost for escrow fees will be a flat $300, regardless of a residence's sales price. In some cases this fee may be greater than the standard cost, in others less.
 
 
 6
 It is undisputed that the discussions between RFC and Chicago Title included discussions over the volume of expected orders. Although there is no evidence that RFC generally passes any escrow fee savings along to the buyers of its properties, Lane managed to receive the benefit of RFC's flat rate because he paid for all the escrow fees. After Lane paid the $900 for escrow services, he initiated this action.
 
 
 7
 His complaint alleges that the flat rate arrangement between RFC and Chicago Title for escrow fees is an illegal "kickback" that rewards RFC for referring business to Chicago Title. According to Lane, this violates section 8(a) of RESPA, 12 U.S.C. § 2607(a).[2] This portion of the case was certified as a class action in November 1998.
 
 
 8
 The district court granted Chicago Title's motion for summary judgment on the RESPA claim. The motion was granted on the ground that the discounts Chicago Title provides RFC on its escrow fees are not discounts for referring buyers. The district court concluded that these discounts are based on Chicago Title's lowered costs when dealing with RFC, which are attributable to RFC's familiarity with escrow transactions and its use of standardized forms and procedures. These lowered costs result from "economies of scale" that are related, at least in part, to the volume of business provided by RFC.
 
 
 9
 The district court also held that the discount on title insurance services was explained by the lower costs associated with RFC's properties. Most of RFC's residential sales involve recent foreclosures, which reduces the extent of any title search. This is because the foreclosed properties usually have a recent title report or trustee sale guarantee available. The district court also held that there was no evidence that the rates charged to RFC were abnormally low or related to anything other than recognized economic principles. Following judgment in the case, Lane appealed, seeking reversal of the summary judgment.
 
 
 10
 After judgment in the district court, Chicago Title moved for attorneys fees, claiming the status of a "prevailing party" under 12 U.S.C. § 2607(d)(5).[3] The district court denied this motion, holding that RESPA's attorneys fee provision is governed by the plaintiff-friendly dual standard of Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), and finding that Chicago Title is not entitled to fees under this standard. Chicago Title appeals that order, arguing that the district court should have evaluated the motion under the more favorable standards for defendants found in Fogerty v. Fantasy, Inc., 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).
 
 II
 
 11
 We review de novo the grant of summary judgment. Oliver v. Keller, 289 F.3d 623, 626 (9th Cir.2002). The order denying attorneys fees is reviewed for an abuse of discretion. See, e.g., Barrios v. California Interscholastic Fed., 277 F.3d 1128, 1133 (9th Cir.2002). A district court abuses its discretion if it applies the wrong legal standard. Akopyan v. Barnhart, 296 F.3d 852, 856 (9th Cir.2002). Applying these standards of review, we conclude that both district court decisions are correct.
 
 III
 
 12
 Lane argues that the flat rate escrow fees and lower title insurance rates paid by RFC constitute discounts provided in return for referrals. He contends that these discounts are kickbacks under section 8(a), relying heavily on a regulation issued by the Department of Housing and Urban Development ("HUD"), 24 C.F.R. § 3500.14(e). This regulation provides, in relevant part:
 
 
 13
 When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.
 
 
 14
 24 C.F.R. § 3500.14(e). Under Lane's theory, RFC repeatedly receives discounts that are "connected" to the volume of business referred because the "economies of scale" justifying the discounts ultimately rest on the volume of business provided. Based on this, he contends that one may infer that Chicago Title and RFC are parties to a prohibited "discount for referral" agreement.
 
 
 15
 The district court disagreed with Lane's analysis, finding the broad language of RESPA's section 8 and 24 C.F.R. § 3500.14(e) is limited to situations where the "thing of value" is not based on "economies of scale or other recognized economic principles." We hold that the discount arrangement between RFC and Chicago Title did not violate section 8(a) of RESPA because the discounts and total compensation are reasonably related to the value of services that are actually performed.
 
 
 16
 In so holding, we use the test developed by HUD for determining whether a type of fee paid to real-estate brokers by mortgage lenders, called a "yield spread premium," is prohibited or not. See RESPA Statement of Policy 2001-1 ("2001 Policy Statement"), 66 Fed.Reg. 53052, 53054 (Oct. 18, 2001). Under this test, a discount on settlement services given to a seller of real estate is not prohibited under section 8(a) when: 1) goods and facilities are actually furnished or services are actually performed for the compensation paid, and 2) the discount is reasonably related to the value of the goods or facilities actually furnished or the services actually performed. Id.
 
 A.
 
 17
 The district court held that RESPA does not prohibit discounts that are based on economies of scale or other recognized economic principles. The district court considered two questions: 1) did the undisputed evidence show that the cost of providing escrow services and title services to RFC is lower than it is for providing such services to individual sellers? and 2) did the undisputed evidence show that the rates charged by Chicago Title for the services it actually provides are not abnormally low? The district court answered both questions in the affirmative.
 
 
 18
 The district court's approach in this case parallels the test developed by HUD to evaluate yield spread premiums. See 2001 Policy Statement, 66 Fed.Reg. at 53054. Understanding HUD's approach to yield spread premiums sheds significant light on this case.
 
 
 19
 Yield spread premiums involve payments from mortgage lenders to mortgage brokers. See Schuetz v. Banc One Mortgage Corp., 292 F.3d 1004, 1007 (9th Cir. 2002). With a yield spread premium, mortgage lenders establish a hypothetical interest rate that is called the "par rate." Id. at 1007-08. When a mortgage broker's client takes out a loan at a rate higher than the "par rate," the lender pays a bonus, the yield spread premium, to the mortgage broker. Id. The amount of the yield spread premium is linked to the difference between the "par rate" and the rate of the loan. Id. at 1007. The higher the loan rate, the higher the compensation paid to the broker. Id. By choosing among various lenders and interest rates, a broker may, in effect, control his fees. Id.
 
 
 20
 This practice leaves room for brokers to increase their gross receipts at the expense of their clients. 2001 Policy Statement, 66 Fed.Reg. at 53054. At the same time, the practice also offers a way for brokers to originate residential loans for those who cannot afford the standard fees charged for brokerage services. Id.
 
 
 21
 HUD is aware of both the benefits and dangers associated with yield spread premiums. Id. As a result, it has formulated a two-part test to determine in a given case whether a yield spread premium is prohibited by RESPA or not ("the HUD test"). HUD first asks whether the mortgage broker actually provided goods, facilities or services. Id. If not, then section 8(a) is violated. If the mortgage broker has provided goods, facilities or services, however, HUD then requires that the total compensation paid to the broker be reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed. Id. The HUD test implements section 8(a) in a context where the party referring business to a settlement service provider is also providing compensable services to the settlement service provider.[4] See id. at 53055. In Schuetz, we held that this HUD test was entitled to substantial deference and affirmed a summary judgment decision finding a particular yield spread premium did not violate section 8(a). 292 F.3d at 1014.
 
 
 22
 As with yield spread premiums, the referring party in this case, RFC, entered into a relationship with a settlement service provider, Chicago Title, in which compensable services were exchanged above and beyond any referrals. The parallels between this case and Schuetz persuade us to utilize the HUD test and to reach a similar outcome. We do note, however, two surface differences between this case and Schuetz. The first centers on the "thing of value" involved, in this case discounts rather than the payments evaluated in Schuetz. The second is the factor used to calculate the "thing of value," in this case the volume of referrals, whereas Schuetz dealt with the value of a referral.[5] We conclude that these differences are immaterial in addressing Lane's challenges to the district court's decision.
 
 B.
 
 23
 Lane challenges the legal sufficiency of the district court's conclusions, rather than attacking the facts and inferences supporting them. His primary contention is that neither economies of scale nor any other justification for the discounts have relevance to the kickback inquiry once it is established that "a thing of value is received repeatedly and is connected in any way with the volume ... of the business referred," invoking 24 C.F.R. § 3500.14(e). Schuetz rejected this argument in the context of yield spread premiums and we reject it here. 292 F.3d at 1013. Under HUD's interpretation of section 8, 24 C.F.R. § 3500.14(e) simply does not apply when a defendant can meet the HUD test. Id. When the HUD test is met, any "things of value" a defendant receives are treated as compensation for goods, facilities or services, even if the compensation is not offered in direct exchange for goods, facilities or services. Id. at 1012.
 
 
 24
 Lane contends that the district court's approach is inconsistent with the plain language of section 8(a). He argues that the statute imposes a strict regime, whereby any discount tied in any way to volume is prohibited, and that the statute is clear on this point. We have recognized, however, that "§ 8 can reasonably be construed as only prohibiting payments that are for nothing else than the referral of business." Schuetz, 292 F.3d at 1013 (emphasis added). The district court's approach is not foreclosed by section 8(a).
 
 
 25
 Lane also argues that the district court's reliance on an Illinois state case, Shah v. Chicago Title and Trust Co., 102 Ill. App.3d 787, 58 Ill.Dec. 400, 430 N.E.2d 342 (1981), in determining that economies of scale can justify discounts, was misguided. We acknowledge the approach in Shah which says, "that discounts based upon economies of scale and volume are legitimate business practices." Id. at 345. We need not approve or disapprove of this expansive language. We observe that the district court used Shah in a way that is fully consistent with the HUD test.[6]
 
 
 26
 The district court concluded that the discounts were reasonably related to the services actually performed by RFC, namely its streamlining of the escrow process and reduced title search burdens, which in turn lowered Chicago Title's internal costs.[7] The undisputed evidence supports this conclusion.
 
 
 27
 The district court's analysis is consistent with the approach taken by HUD in the yield spread premium context. Consistent with Schuetz, we hold that discounts that are reasonably related to the value of compensable services performed by a settlement provider for a referring party are simply not discounts for referrals. 292 F.3d at 1012-14. Considering the undisputed facts, not only was the district court's conclusion correct, but it actually applied a more stringent standard than the HUD test we endorsed in Schuetz. The district court focused on the specific services justifying the discount, rather than the total compensation paid to Chicago Title for the services provided. See Schuetz, 292 F.3d at 1013; Heimmermann v. First Union Mortgage Corp., 305 F.3d 1257, 1263-64 (11th Cir.2002) (recognizing HUD test is primarily concerned with total compensation).
 
 
 28
 Lane further contends that the district court's reliance on the following HUD example was inappropriate:
 
 
 29
 A, provider of settlement services, provides settlement services at abnormally low rates or at no charge at all to B, a builder, in connection with a subdivision being developed by B. B agrees to refer purchasers of the completed homes in the subdivision to A for the purchase of settlement services in connection with the sale of individual lots by B. Comments: The rendering of services by A to B at little or no charge constitutes a thing of value by A to B in return for the referral of settlement service business and both A and B are in violation of section 8 of RESPA.
 
 
 30
 24 C.F.R. Pt. 3500, App. B ("the HUD example").
 
 
 31
 The district court inferred from the example that only abnormally low discounts violate RESPA. Lane recognizes that HUD's examples have the binding force of regulations, but he contests the consistency of the example with RESPA and other regulations. This contention, like his others, fails because the HUD example is consistent with the test we approved of in Schuetz, 292 F.3d at 1013-14.
 
 
 32
 Lane also argues that the district court's reasoning conflicts with an Eleventh Circuit case, Culpepper v. Irwin Mortgage Corp., 253 F.3d 1324 (11th Cir.2001). Culpepper concluded that the first step in the HUD test asks not only whether a mortgage broker actually performed some service, but also whether payment was for those services rather than for a referral. Id. at 1331. In Schuetz, we rejected the Culpepper approach and gave deference to HUD's interpretation of section 8, concluding that a defendant does not need to show that the payment is for a particular service before moving on to the total compensation question. Schuetz, 292 F.3d at 1012-13.
 
 
 33
 In declining to follow Culpepper, we followed the example of the Eighth Circuit. See Glover v. Standard Fed. Bank, 283 F.3d 953, 963-65 (8th Cir.2002). After the 2001 Policy Statement was issued, the same panel of the Eleventh Circuit that decided Culpepper came to a different conclusion in Heimmermann, following Glover and Schuetz. See Heimmermann, 305 F.3d at 1263. In the face of Schuetz, Glover, and Heimmermann, Lane's argument fails.
 
 
 34
 Lane's last approach is to suggest that allowing settlement providers to rely on "economies of scale" in giving discounts to institutional sellers like RFC will defeat RESPA's purpose. He contends that the district court's approach creates an absurd situation where individual sellers might be held liable under section 8(a), but institutional providers can take advantage of a massive loophole in section 8.
 
 
 35
 Frankly, we question whether an individual seller receiving a discount on a single transaction would ever be receiving a discount for a referral, particularly where the ultimate price is reasonably related to services actually provided. As for Lane's loophole concern, we note that the Glover court rejected a similar argument before concluding that consumers "are far from unprotected" under the HUD test.[8] Glover, 283 F.3d at 965. We have already indicated our agreement with Glover's reasoning. Schuetz, 292 F.3d at 1013. Lane's unsupported dire forecasts do not change our analysis.
 
 
 36
 Lane's arguments consistently run aground on the rock of Schuetz. The district court's approach was consistent with the HUD test endorsed in Schuetz and Lane does not challenge the district court's application of law to the facts. The district court's decision was correct.
 
 IV
 
 37
 Chicago Title, relying on its success before the district court, moved for attorneys fees. The district court held that Chicago Title was not entitled to fees because it was not a "prevailing party" under 12 U.S.C. § 2607(d)(5). The district court concluded that Lane's claims were not frivolous, unreasonable or without foundation, applying the standard in Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Chicago Title claims the district court followed the wrong precedent, arguing that this case is governed by Fogerty v. Fantasy, Inc., 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), which holds that the attorneys fee provision governing copyright actions treats plaintiffs and defendants equally as "prevailing" parties. We accept the district court's selection of controlling precedent.
 
 
 38
 When RESPA was originally passed, its attorneys fee provision read:
 
 
 39
 In any successful action to enforce the liability under this paragraph, the court may award the court costs of the action together with a reasonable attorney's fee as determined by the court.
 
 
 40
 Pub.L. No. 93-533, 88 Stat. 724, § 8(d)(2)(1974). In 1983, five years after the Christiansburg decision, the attorneys fee provision was amended to its current language, reading:
 
 
 41
 In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees.
 
 
 42
 Pub.L. No. 98-181, 97 Stat. 1153, § 461 (1983) (codified at 12 U.S.C. § 2607(d)(5)). This language is similar to the fee provision at issue in Christiansburg, which read:
 
 
 43
 In any action or proceeding under this title the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs ....
 
 
 44
 434 U.S. at 414 n. 1, 98 S.Ct. 694 (quoting 42 U.S.C. § 2000e-5(k)). In Christiansburg, the Supreme Court holds that successful plaintiffs are generally entitled to attorneys fees under 42 U.S.C. § 2000e-5(k), but successful defendants are only entitled to fees where the plaintiff's action is found to be frivolous, unreasonable, or without foundation. 434 U.S. at 421, 98 S.Ct. 694.
 
 
 45
 We begin by recognizing that "fee-shifting statutes' similar language is `a strong indication' that they are to be interpreted alike," Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 758 n. 2, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989) and that congressional use of language taken from case law is an indication that the common law standard is to be imported into a statute. See, e.g., Schwenk v. Hartford, 204 F.3d 1187, 1202 n. 12 (9th Cir. 2000). The close tracking of the language in RESPA and the Christiansburg statute thus strongly supports the district court's use of the Christiansburg standard, as does the congressional choice to adopt section 2607(d)(5)'s language after Christiansburg.
 
 
 46
 Chicago Title contends, however, that Congress has expressly indicated when it wants to apply different standards to prevailing plaintiffs and defendants in consumer protection statutes like RESPA. As Congress did not expressly indicate that it wanted different standards to apply to prevailing plaintiffs and defendants, Chicago Title believes the district court erred in applying the Christiansburg standard.
 
 
 47
 Chicago Title cites the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692k(a)(3), and the Condominium and Cooperative Abuse Relief Act, 15 U.S.C. § 3608(d) ("Condominium Abuse Relief Act"), to support its interpretation of RESPA's fee provision. Chicago Title fails to persuasively tie these statutes to RESPA's fee provision.
 
 
 48
 The FDCPA provision predates Christiansburg and its standard for awarding attorneys fees differs from the Christiansburg standard. See 15 U.S.C. § 1692k(a)(3) (requiring bad faith). Chicago Title has not shown how it has any bearing on the congressional drafting of fee provisions post-Christiansburg. The Condominium Abuse Relief Act, in contrast, appears to explicitly track the Christiansburg standards without adopting the "prevailing party" language found in RESPA. This provides some support for Chicago Title's argument, but not enough to establish Chicago Title's argument that Congress assumed Christiansburg was limited to civil rights cases. Cf. Pennsylvania v. Delaware Valley Citizens' Council For Clean Air, 478 U.S. 546, 560, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (interpreting attorneys fee provisions in Clean Air Act in parallel with 42 U.S.C. § 1988 because of the statutes' "common purpose," promoting "citizen enforcement of important federal policies"). Chicago Title's arguments are outweighed by the factors supporting Christiansburg as the controlling authority.[9]
 
 
 49
 Although Chicago Title questions the appropriateness of comparing RESPA to a civil rights statute like the one at issue in Christiansburg, RESPA exhibits a purpose that embodies many of the factors central to the holding in Christiansburg. The Christiansburg court emphasized that plaintiffs in Title VII cases are a chosen instrument of Congress, who receive attorneys fees because the unsuccessful defendant is also a violator of federal law. 434 U.S. at 418, 98 S.Ct. 694. The same holds true for RESPA plaintiffs. See Glover, 283 F.3d at 965 ("Congress has guaranteed legal representation under RESPA by permitting attorneys fees and costs as part of each allowable recovery. This permits and encourages individual consumers to raise valid RESPA claims.") (internal citations omitted). These similarities favor adopting Christiansburg's dual standard.
 
 
 50
 Interpreting RESPA's fee provision in accord with Christiansburg is most consistent with the 1983 changes to the statute. Prior to 1983, RESPA's fee provision only authorized costs and attorneys fees for successful plaintiffs. The current version indicates a change in that stance, but not a wholesale shift. Cf. Christiansburg, 434 U.S. at 420, 98 S.Ct. 694 ("If anything can be gleaned from these fragments of legislative history, it is that while Congress wanted to clear the way for suits to be brought under the Act, it also wanted to protect defendants from burdensome litigation having no legal or factual basis.").
 
 
 51
 In contrast, the Fogerty Court found certain factors that were crucial to the Christiansburg holding were missing in the Copyright Act context and rejected the application of Christiansburg's dual standard for the Copyright Act. See Fogerty, 510 U.S. at 524, 114 S.Ct. 1023. Most of these factors are present in this case. We conclude that RESPA's attorneys fee provision falls closer to the rule of Christiansburg than that of Fogerty, making the district court's adoption of Christiansburg's dual standard appropriate. The district court properly exercised its discretion in denying Chicago Title's request for attorneys fees under this standard.
 
 V
 
 52
 We conclude that Chicago Title's discounts to RFC did not violate RESPA's section 8 as a matter of law. The district court did not abuse its discretion in denying Chicago Title's motion for attorneys fees. The summary judgment and the post-judgment order denying fees are both AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 These services are "settlement services" under RESPASee 24 C.F.R. § 3500.2. Settlement services include "any service provided in connection with a prospective or actual settlement." Id. In turn, settlement "means the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." Id. Settlement may be referred to as "closing" or "escrow." See id.
 
 
 [2]
 Section 8(a) provides:
 No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
 12 U.S.C. § 2607(a).
 
 
 [3]
 Title 12 U.S.C. § 2607(d)(5) provides: "In any private action brought pursuant to this subsection, the court may award the prevailing party the court costs of the action together with reasonable attorneys fees."
 
 
 [4]
 For yield spread premiums, HUD recognizes that the loan broker receiving the premium performs compensable services for both the borrower and lender, but looks to the total compensation the broker receives from both sources in relation to the "total set of goods or facilities actually furnished or services" performed because the loan broker's work ultimately benefits both sides to the transaction. 2001 Policy Statement, 66 Fed. Reg. at 53055
 
 
 [5]
 Chicago Title raises another potentially significant difference between this case andSchuetz: RFC's role as a party to the underlying real estate transaction. Chicago Title argues that RESPA applies only to exchanges between third-party settlement service providers and not to services provided directly to sellers, even institutional sellers like RFC. In light of our holding, we find it unnecessary to address this argument.
 
 
 [6]
 Our deference to the HUD test inSchuetz also defeats Lane's reliance on another Illinois case, Fitzgerald v. Chicago Title & Trust Co., 72 Ill.2d 179, 20 Ill.Dec. 581, 380 N.E.2d 790 (1978), to support his theory of the case.
 
 
 [7]
 Lane also failed to show that Chicago Title's charges for the services it provided, whether looked at individually or collectively, were abnormally lowSee 24 C.F.R. Pt. 3500, App. B (example 1); Schuetz, 292 F.3d at 1013 (HUD's test focuses on total compensation related to the services provided).
 
 
 [8]
 We also note that there are a variety of authorities in place that may significantly narrow the reach of this "loophole," if there is oneSee 12 U.S.C. § 2608 (prohibiting sellers from requiring buyers to use particular title insurance companies); Schuetz, 292 F.3d at 1013 (compensation must be reasonably related to services); Aiea Lani Corp. v. Hawaii Escrow & Title, Inc., 64 Haw. 638, 646-47, 647 P.2d 257 (1982) (arrangement where builder received loan at 10% of cost for referring individual buyers to settlement service provider violates RESPA).
 
 
 [9]
 In its reply brief, Chicago Title suggests that the parallel treatment of costs and attorneys fees in section 2607(d)(5) distinguishes this case fromChristiansburg. The reply brief was not the time to raise this argument. It is waived and we need not consider it. See United States v. Alcan Elec. & Eng'g, Inc., 197 F.3d 1014, 1020 (9th Cir.1999).