# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3611

_____

| | | |
|---|---|---|
| Lonnie Glover; Dawn Glover, | * | |
| | * | |
| Plaintiffs/Appellees, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| Standard Federal Bank, | * | of Minnesota |
| | * | |
| Defendant/Appellant, | * | |
| | * | |
| Heartland Mortgage, | * | |
| | * | |
| Defendant. | * | |

_____

Submitted: October 19, 2001

Filed:  March 21, 2002

_____

Before McMILLIAN, BEAM, and MURPHY, Circuit Judges.

_____

BEAM, Circuit Judge.

The district court issued its first class certification in this matter on March 22, 2000, certifying a class defined as all people obtaining a mortgage brokered by Heartland Mortgage ("Heartland") and financed by Standard Federal Bank ("Standard Federal").  On September 26, 2000, the district court modified its class certification to create a nationwide class defined as all individuals who obtained a mortgage

financed by Standard Federal and brokered by *any* mortgage broker. This nationwide class certification, encompassing potentially hundreds or thousands of loans, is the subject of this interlocutory appeal. Standard Federal appeals from the district court order confirming class certification. For the reasons set forth below, we reverse.[1]

## I. BACKGROUND

Named plaintiffs Lonnie and Dawn Glover acquired an adjustable rate mortgage for the purchase of their home in the late 1980s. In 1996, they refinanced their loan and obtained a fixed-rate mortgage. Heartland brokered the 1996 transaction and Standard Federal funded and acquired the 1996 mortgage.

As part of the 1996 refinancing, Heartland brokered a mortgage for the Glovers with an "above par" interest rate and was subsequently paid a yield spread premium ("YSP") by Standard Federal.[2] The payment of this YSP is the focus of the current dispute.

The Glovers argue that the payment of the YSP constitutes a fee for the referral of a mortgage negotiated with interest rates that are disadvantageous to borrowers, and that this payment violates the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, et. seq. RESPA was enacted to initiate significant reforms in the real estate settlement process "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges

---

[1]We also note that a motion of Lonnie and Dawn Glover to strike the affidavit of Margaret K. Savage was taken with the case. The motion is granted.

[2]The disputed payment in the instant case is actually referred to as a "service release premium" in the required Department of Housing and Urban Development disclosures form.

caused by certain abusive practices." 12 U.S.C. § 2601(a). RESPA prohibits the payment of some referral fees, stating:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a) ("Section 8"). Subsection (c) of section 2607 then qualifies subsection (a) by stating:

> Nothing in this section shall be construed as prohibiting (1) the payment of a fee . . . (C) by a lender to its duly appointed agent for services actually performed in the making of a loan, [or] (2) the payment to any person of . . . compensation or other payment for goods or facilities actually furnished or for services actually performed . . ..

12 U.S.C. § 2607(c)(1) & (2). At issue in this case is whether payment of a YSP violates RESPA's prohibition against referral fees, or whether a YSP might satisfy RESPA's qualification of payments for goods and facilities actually furnished or services actually performed, which payments are not prohibited. A brief explanation of the industry practice regarding YSPs provides helpful insight.

In the arena of retail and wholesale mortgages, banks such as Standard Federal fund mortgage loans originated by mortgage brokers. Mortgage brokers provide origination services and bring a borrower and a lender together to complete a loan. The Department of Housing and Urban Development ("HUD") estimates that mortgage brokers initiate about half of all home mortgages each year in the United States. These brokers provide "various services in processing mortgage loans, such as filling out the application, ordering required reports and documents, counseling the

-3-

borrower and participating in the loan closing." Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10081 (March 1, 1999) (hereinafter "HUD Policy Statement I"). Brokers may also offer goods and facilities such as office space and equipment to carry out loan-making functions. Id.

Brokers are entitled to compensation for their work and borrowers may choose to pay these fees in a variety of ways. The fees may be paid out-of-pocket by the borrower, they may be financed by adding the amount of such fees to the principal balance of their loan, or they may be paid indirectly by the borrower by way of a YSP paid by the lender to the broker. The second approach may not be available to all borrowers, however, if their loan-to-value ratio has already reached the maximum permitted by the lender. The payment of a YSP from the lender to the broker permits homebuyers to pay some or all of the up-front settlement costs over the life of the mortgage through a higher interest rate. HUD Policy Statement I, at 10081.

In determining the amount of YSP to pay, wholesale lenders such as Standard Federal establish a wholesale price for originating loans and communicate this pricing schedule to brokers through daily rate sheets. Rate sheets set forth the amount that the wholesale lender will pay brokers for various types of mortgage loans, taking into account a number of variables. These rate sheets discuss loans in terms of "above par," "at par," and "below par."[3] "The term 'par rate' refers to the rate offered to the broker . . . at which the lender will fund 100% of the loan with no premiums or discounts to the broker." HUD Policy Statement I, at 10081, n.1. If "the mortgage

---

[3]Although both parties to this appeal refer to these three rate terms in briefing, our examination of the record fails to disclose that rate sheets, if any, available to the district court actually set forth these three rates. The Glovers offer to supplement the record with a series of Standard Federal rate sheets, an offer we have declined, but even these papers appear to contain only a single, published base rate for each type of loan available.

carries a higher interest rate, the lender is able to sell it to an investor at a higher price. In turn, the lender pays the broker an amount reflective of this price difference." Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed. Reg. 53052, 53054 (October 18, 2001) (hereinafter "HUD Policy Statement II").

Regardless of how the broker compensation is handled, all costs are ultimately paid by the borrower, whether through direct fees paid to the broker, through the loan principal or through the interest rate arranged with the lender. So, when a mortgage broker originates a loan above par, the broker receives a YSP payment from the mortgage lender which is based upon the daily rate sheet and the interest rate of each loan offered by the broker to the borrower. HUD Policy Statement I, at 10081. In this way, as earlier indicated, the borrower indirectly finances the amount of that premium through the mortgage lender so as to avoid the necessity of a direct payment to her broker, thereby reducing the amount of out-of-pocket expenses required at, or prior to, closing. Id. Some consumers, like the Glovers, allege that this compensation system is illegal under RESPA because it fosters the payment of prohibited referral fees. Others view this practice as an option that fosters homeownership because it reduces the amount of money required from borrowers up-front and out-of-pocket. HUD Policy Statement II, at 53054. In any event, wholesale lenders such as Standard Federal claim, and apparently stand ready to attempt to prove at trial, that they ultimately receive the same compensation from each loan, whether or not a YSP is paid as part of the transaction. This is because, they argue, the increased amounts received from secondary investors for a higher interest rate loan are, as noted by HUD Policy Statement II, usually passed along to the broker for services rendered.

## II.    DISCUSSION

### A.    Jurisdiction

Pursuant to Federal Rule of Civil Procedure 23(f), "[a] court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification . . . if application is made to it within ten days after entry of the order." The Glovers argue that this court lacks jurisdiction to review the district court's September 26, 2000, order because it was not an order granting or denying class certification. We disagree.

Rule 23(a) of the Federal Rules of Civil Procedure sets forth the threshold requirements for certification of a class. A class may be certified if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, to maintain a class action the court must find that one of the requisites of Rule 23(b) is present, among them being that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

On March 22, 2000, the district court held that the Glovers met their burden under Rule 23 and defined the potential class as all people obtaining a mortgage brokered by Heartland and financed by Standard Federal under circumstances which gave rise to any of the type of incentive payments described in the complaint. On September 26, 2000, pursuant to a request by the Glovers to clarify the class, the district court recognized it did not previously define the class as the Glovers

requested. The district court concluded that a nationwide class was consistent with the common questions of law and fact discussed in the March 22, 2000, order, and certified a nationwide class of "all people obtaining a mortgage during the appropriate time period, financed by Standard Federal Bank under circumstances which gave rise to yield spread premiums or service release premiums, and brokered by *any* mortgage broker pursuant to a Correspondent Agreement identical to the Correspondent Agreement between Standard Federal Bank to Heartland Mortgage Corp." Appellant's Addendum at 30-31 (emphasis added).

The district court order at issue does not merely deal with a clarification of the scope and contour of the class as the Glovers profess. The September 26, 2000, order opens up the class to individuals working through an entire network of mortgage brokers across the nation beyond the more limited group, outlined in the March 22, 2000, order, of those individuals who obtained a mortgage brokered only by Heartland. Clearly, as to both these newly defined class members and those described on March 22, the September 26 order constitutes class certification. The district court labeling the order a clarification does not change this fact.

As we have done on two previous occasions in this case, we find jurisdiction pursuant to Federal Rule of Civil Procedure 23(f) appropriate to review the district court order granting class certification.

B.      Standard of Review

We review a district court's ruling granting or denying class certification for abuse of discretion. Chaffin v. Rheem Mfg. Co., 904 F.2d 1269, 1275 (8th Cir. 1990).

## C.    Measure of Deference Provided HUD's Statements of Policy

In March 1999, and again in October 2001, HUD issued Statements of Policy regarding lender payments to mortgage brokers. HUD's Policy Statement I responded to a Conference Report on the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, directing HUD to clarify its position on lender payments to mortgage brokers.[4]  In October 2001, HUD published Policy Statement II in order to "eliminate any ambiguity concerning the Department's position with respect to those lender payments to mortgage brokers characterized as yield spread premiums . . . as a result of questions raised by two recent court decisions, Culpepper v. Irwin Mortgage Corp. and Echevarria v. Chicago Title and Trust Co., respectively."  HUD Policy Statement II, at 53052.  Policy Statement II specifically expresses HUD's disagreement with the

_____

[4]Notwithstanding the fact that HUD issued its Policy Statement at the directive of a Conference Report, we apply only the standards set by legal precedent in determining the measure of deference to give HUD's communication.  The statement that  "Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of . . . RESPA," constitutes only a congressional committee's post facto interpretation of the law.  Congress may not conscript agencies to legislate for it.  If Congress wishes to legislate conclusively, it must do so directly.  A statement made by Congress after the legislative process does not have the force of law and is almost wholly unpersuasive.  Reviewing courts must also be careful not to allow an agency to create _de facto_ new regulations under the guise of interpreting an earlier regulation. See Christensen v. Harris County, 529 U.S. 576, 588 (2000).  HUD most appropriately expresses its concern on this matter in its 1999 Statement of Policy when it states its own belief that "broad legislative reform . . . remains the most effective way to resolve the difficulties and legal uncertainties under RESPA and the Truth in Lending Act (TILA) for industry and consumers alike."  HUD Policy Statement I, at 10080. Our decision today credits HUD's Policy Statements with only the amount of deference due an agency's interpretation of its own regulation, as established by the Supreme Court. See Christensen, 529 U.S. 576.

judicial interpretation regarding Section 8 of RESPA and the 1999 Statement of Policy as set forth in Culpepper. Id. at 53054-55.

Whether or not we follow HUD's Policy Statements is dispositive in this case because if we endorse the two-part test advocated by HUD, the inquiry in each case must necessarily be made on a loan-by-loan basis, therefore eliminating class treatment. The Glovers argue that the Policy Statements issued by HUD are contrary to RESPA and are thus entitled to no deference.

HUD Policy Statement I sets forth a two-part test to determine whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA:

> [T]he first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.
>
> In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. The Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed. HUD believes that total compensation should be carefully considered in relation to price structures and practices in similar transactions and in similar markets.

HUD Policy Statement I, at 10084.

HUD Policy Statement II sets forth, among other things, the following clarification of the HUD test contained in Policy Statement I:

1. *The First Part of the HUD Test:*

Under the first part of HUD's test, the total compensation to a mortgage broker, of which a yield spread premium may be a component or the entire amount, must be for goods or facilities provided or services performed. HUD's position is that in order to discern whether a yield spread premium was for goods, facilities or services under the first part of the HUD test, it is necessary to look at each transaction individually, including examining all of the goods or facilities provided or services performed by the broker in the transaction, whether the goods, facilities or services are paid for by the borrower, the lender, or partly by both.

It is HUD's position that neither Section 8(a) of RESPA nor the 1999 Statement of Policy supports the conclusion that a yield spread premium can be presumed to be a referral fee based solely upon the fact that the lender pays the broker a yield spread premium that is based upon a rate sheet, or because the lender does not have specific knowledge of what services the broker has performed.

. . .

Whether or not a yield spread premium is legal or illegal cannot be determined by the use of a rate sheet, but by how HUD's test applies to the transaction involved.

HUD Policy Statement II, at 53055.

When reviewing an agency's construction of a statute it administers, a court must first ask whether Congress has directly spoken to the precise question at issue.

Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842 (1984). The legality of a YSP payment (or any other specific type of payment) to a mortgage broker is not directly addressed by RESPA. Neither is how one deals with the tension created by the words of Sections 8(a) and 8(c). Thus, the intent of Congress on this issue is not expressly set forth in the statute. Therefore, under Chevron, we must determine whether HUD's analysis as set forth in its regulation is based on a permissible construction of the statute. Id. at 843.[5]

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Id. at 843-44. Agency regulations promulgated under express congressional authority are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Id. at 844. In the instant case, it appears Congress did intend to delegate authority to HUD by expressly authorizing HUD to "prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of [RESPA]." 12 U.S.C. § 2617(a). HUD promulgated rules under RESPA at 24 C.F.R. § 3500.01 et. seq., subject to notice-and-comment. Because these rules were promulgated under the express authority of Congress and adjudicated with apparent congressional intent to carry the force of law, they are accorded Chevron deference. United States v. Mead Corp., 121 S. Ct. 2164, 2172 (2001). However, these regulations are not directly at issue today, as the language of the Section 8(a) regulation issued by HUD simply mirrors that of the statute.[6]

---

[5]If the statute is unambiguous, as claimed by the Glovers, we think, as later explained, any lack of ambiguity runs in the direction of HUD's construction of the law and not the analysis advanced by the Glovers.

[6]Section 3500.14(b) mirrors Congress' directive in 12 U.S.C. § 2607 and states "[n]o person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan

We are called upon today to review HUD's two Statements of Policy, which interpret HUD's own regulations promulgated under RESPA and which set forth the two-part test, to determine whether, or under what circumstance, a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA. "[I]nterpretations contained in policy statements . . . which lack the force of law–do not warrant Chevron-style deference." Christensen v. Harris County, 529 U.S. 576, 587 (2000) (citing EEOC v. Arabian American Oil Co., 499 U.S. 244, 256-258 (1991) (measuring deference given an EEOC policy statement interpreting a statute on Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) standards and not Chevron standards)).

In this case, however, we have a duly promulgated regulation, which has the force of law under Chevron, but which for our purposes continues the statutory ambiguity. It remains unstated and unclear under the regulation, as under the statute, whether payment of a YSP to a mortgage broker does, or must, in whole or in part, constitute an unearned fee. Thus we are not dealing with Mead, and its corresponding line of cases, which address the issue of deference due regulations or other congressionally authorized interpretations of a guiding statute. See Mead, 533 U.S. 218; Chevron, 467 U.S. at 842; Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (giving lesser agency rulings, statements, interpretations and opinions concerning statutory meaning deference only proportional to their power to persuade given the agency's specialized experience, investigations and available information).

We look, instead, to Bowles v. Seminole Rock & Sand Co. and its progeny for guidance in determining what deference is due an agency interpretation of its own ambiguous regulation. See Christensen, 529 U.S. at 588 (giving deference to an agency's interpretation of its own regulation only if the language of the regulation is

shall be referred to any person." Like the statute, the regulation makes no attempt to further define or describe the nature or character of the type of payment that would or would not be a prohibited "referral" fee.

ambiguous); Auer v. Robbins, 519 U.S. 452, 461 (1997) (giving controlling deference to an agency's interpretation of its own ambiguous regulation unless plainly erroneous or inconsistent with the regulation); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14 (1945) ("Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."). Referring to this line of cases, we believe that HUD's Policy Statements interpreting its own ambiguous regulation are controlling authority unless they are plainly erroneous or inconsistent with the regulation or the purpose of RESPA. Christensen, 529 U.S. at 588 (construing Auer v. Robbins, 519 U.S. at 462 ).

However, if Christensen does not contemplate situations, as here, where the agency regulation does nothing more than mirror the ambiguous language of the statute, our decision to give deference to HUD's Policy Statements remains steadfast. See Cunningham v. Scibana, 259 F.3d 303, 307 n.1 (4th Cir. 2001) (holding that Christensen does not apply if there is no ambiguous interpretive language in the regulation, that is if the agency "simply repeated the statutory language in the regulation and left its interpretation of [the statutory language] to a program [or policy] statement," Skidmore principles apply). HUD's Policy Statements in this instance pack sufficient power to persuade given HUD's specialized mission, experience and broad investigation into the consumer lending market. Skidmore, 323 U.S. at 140.

In sum then, applying either Christensen or Skidmore, we find that the Policy Statements issued by HUD reflect a reasoned view of a responsible agency which is consistent with the statute and the regulation and which constitutes a body of experience and informed judgment that this court may look to as determinative authority. And, we do so.

-13-

## D.  The Policy Statements

The Glovers reject HUD's analysis.  In support of the district court's decision, the Glovers argue that under the plain language of RESPA, the first inquiry is always whether the YSP premium is payment *for* a prohibited referral rather than *for* facilities, goods and services.  If the YSP is really a referral fee, the payment violates RESPA regardless of the fact that the broker may actually perform services.  Thus, the first inquiry, says the Glovers, focuses not on whether facilities, goods and services were provided, but on what the payment is *for*.

The Glovers further argue that evidence of the nature, value and reasonableness of facilities, goods and services provided in a particular transaction is essentially irrelevant in this first inquiry.  They assert that because the total dollar amount of a YSP paid to a broker depends solely on the rate of interest brokered for the borrower, and because the payment of these premiums by Standard Federal is based upon a course of business guided by identical Correspondent Agreements, there is no need for an individualized inquiry. Class certification is appropriate, they say, because this evidence establishes that the YSP premium is payment *for* a referral, thus raising at least a presumption of liability.  These are the questions of fact that preponderate, they contend.  The Glovers allege that Standard Federal's practice focuses on a systematic marketing program of paying repeated fees and bonuses based only on the value and frequency of referrals without knowledge of the quantity or quality of services provided by each mortgage broker.[7]

---

[7]In their briefing and supplemental submissions in this case, the Glovers make much of the fact that Standard Federal pays bonuses to their network of brokers as generalized proof of prohibited payments under RESPA.  However, the name given any payment to a broker is not the important issue under RESPA. We look at the total compensation, whatever its form.  See HUD Policy Statement I, at 10084.

The Eleventh Circuit has arguably endorsed at least part of this line of reasoning in its recent decision in Culpepper v. Irwin Mortgage Corp., 253 F.3d 1324 (11th Cir. 2001), cert. denied, 122 S. Ct. 930 (2002). In Culpepper, a panel of the circuit affirmed class certification in a similar case where mortgagors brought a class action against a mortgage lender, arguing that the lender's payment of YSPs to a mortgage broker violated the anti-kickback provision of RESPA. Id.[8] The court rejected the lender's contrary argument, stating "[i]f [the lender] has read the HUD Statement correctly . . . HUD has now decided that § 8(c) deems *some* such referral fees legal–that is, referral fees that are paid by lenders and that would be reasonable service fees, if that's what they were." Id. at 1330. The Eleventh Circuit interpreted HUD Policy Statement I, an interpretation now repudiated by HUD, see HUD Policy Statement II, and ultimately found that "the first step in the test for liability under § 8 is not only whether the broker performed some of the services described in the HUD Statement, but also whether the yield spread premium is payment for those services rather than for a referral." Culpepper, 253 F.3d at 1331. The court in Culpepper reasoned that if the purpose of the lender payment is only for referrals and not for services, you do not get to step two of HUD's two-part test. Id. Under this interpretation, focusing only on a purported search for the lender's intent in each case, Culpepper found that similar questions of fact predominate, justifying class treatment.[9]

---

[8]There is, perhaps, a significant factual difference in Culpepper. There, the class consists of "persons who . . . obtained . . . [a] loan . . . wherein the broker was paid [presumably by the borrower] a loan origination fee of 1% or more and wherein [the lender] paid a 'yield spread premium' to [the] mortgage broker." 253 F.3d at 1326. No such loan origination fee is required for membership in the proposed class in this case.

[9]We note, however, that for this case Culpepper does not appear to be apposite precedent. The Eleventh Circuit, in its exercise interpreting HUD Policy Statement I, appears to have given at least some deference to HUD policy pronouncements. But, Culpepper was considered and published prior to HUD's more recent Policy Statement of October 18, 2001, a policy that we believe is due either Christensen or

-15-

Both the Eleventh Circuit and the Glovers profess that they adopt HUD's statement that YSPs are not "per se" illegal. HUD Policy Statement I at 10084, Culpepper, 253 F.3d at 1331, Appellees' Brief at 64. In doing so, they advance a few factual scenarios under which they claim a YSP payment might pass muster under RESPA. Given the gloss the Glovers would place on RESPA, we are not persuaded that they describe realistic examples. In the context of the residential loan industry as it exists today, we have difficulty seeing many, if any, factual situations in which a YSP could lawfully coexist with their contentions. Using the Glovers' interpretation of the statute, inventive minds making clever arguments can turn virtually *any* payment flowing from a lender to a broker, in connection with the placement of a mortgage loan, into a purported payment for the unlawful referral of business. However, Section 8(c) clashes with this result. It clearly states that reasonable payments for goods, facilities or services actually furnished are *not prohibited* by RESPA, even when done in connection with the referral of a particular loan to a particular lender. The Glovers' approach tends to turn the interrelated sections upside down, putting total emphasis on the prohibitory language of Section 8(a) and no emphasis on the permissive language of Section 8(c).

HUD's Policy Statements, on the other hand, reconcile both facets of RESPA policy. HUD requires a determination of whether goods or facilities were actually furnished or services were actually performed and whether the amounts of the payments are reasonably related to the value of these goods, facilities, or services. HUD Policy Statement I, at 10084; HUD Policy Statement II, at 53054. We agree

_____

Skidmore deference. As previously noted, the court in Culpepper reached its final conclusion by finding HUD's two-part test "ambiguous" thus leaving room for the court to inject its own interpretation of HUD's intent. The Eleventh Circuit has not stated its position regarding the deference due HUD Policy Statement II. We will not conjecture whether it will remain steadfast in its position regarding the ambiguity of HUD's Policy Statement now that HUD has clearly stated that it differs with the analysis made in Culpepper.

with this approach because we believe that one cannot take a tightly focused look at but one side of the prohibited/permitted equation. A lender's reliance on a rate sheet to uniformly offer and calculate a YSP payable to a broker does not, without more, mean that class certification is appropriate. Nor does it mean that you can presume that each payment reflects payment of a prohibited referral fee simply because the lender does not have specific knowledge of the nature and amount of service the broker performs in conjunction with a particular loan or group of loans. HUD Policy Statement II, at 53055. Like HUD, we doubt that many, if any, lenders are ignorant of the fact that brokers perform many unique services during these transactions, in addition to bringing the borrower and lender together. HUD Policy Statement II, at 53055. Indeed, the preliminary and closing papers in each transaction identify and quantify services performed, facilities used and goods supplied. In fact, the predominant reason lenders use brokers at all is to provide borrowers the necessary goods, services and facilities that the lender itself chooses not to offer, for economic or other business-related reasons.

Contrary to the Glovers' argument, HUD's two-part test is fully consistent with RESPA. Reviewing services performed and their value on a case-by-case basis does not run afoul of the proscription stated in Section 8(a) prohibiting payments for referrals. Nor does it mean that you retroactively purify unlawful referral fees by offsetting their existence against the performance of legitimate settlement services. Indeed, the Glovers' course effectively writes Section 8(c) out of RESPA. As noted, Section 8(c) clearly anticipates payments to individuals for goods or facilities actually furnished or for services actually performed, and specifically excludes these payments from the Section 8(a) proscription. 12 U.S.C. § 2607(c)(2). Nothing in RESPA prohibits such payments in the mode of a YSP, or in any other particular form, and HUD's test simply helps determine whether the YSP, by its existence, use and amount, falls within or without the permissive boundaries of Section 8(c).

We reject the Glovers' claim that HUD's policy provides a self-serving reasonability valuation system operating within a discrete mortgage lender/broker market, a system that drowns any reasonability standard in a sea of broker-only comparisons. This argument is unsupported. The analysis will necessarily involve values affixed to the same or similar goods, facilities or services both within and without the local mortgage broker industry. If total compensation paid by the lender to the broker in a given transaction exceeds a reasonable amount for the goods, services and facilities provided, it is likely that a RESPA violation has been established. American courts have accurately and fairly determined reasonability in similar situations since their inception, and they will do so in the Glovers' case, if necessary.

If HUD's step one analysis is not undertaken prior to a class-wide pronouncement of RESPA liability, it is almost certain that at least some legitimate Section 8(c) activities now performed by mortgage brokers will be left uncompensated. Should this occur, the present borrower/broker/lender relationship will disintegrate, at least for those buyers who must borrow above par in order to finance settlement services.

Under HUD policy, the Glovers and the individual members of the proposed class are far from unprotected by RESPA. If the case-specific inquiry establishes at step one that no compensable services were performed in return for the YSP, the inquiry ends and a violation is probably made out. If compensable goods, facilities or services are provided, HUD's step two leads to a RESPA remedy if any part of the total payment, including the YSP, proves to be excessive and, thus, an unlawful referral fee. And, even though each RESPA violation will usually not yield a large judgment, Congress has guaranteed legal representation under RESPA by permitting attorneys fees and costs as part of each allowable recovery. 12 U.S.C. § 2607(d)(5). This permits and encourages individual consumers to raise valid RESPA claims. Accordingly, a class action is not necessary for justice to be done.

-18-

Finally, a loan-specific inquiry to determine liability under RESPA is further supported by RESPA's own directions for a loan-specific inquiry to measure damages. Section 2607(d)(2) of RESPA calculates damages for a violation of the act "equal to three times the amount of any charge paid for such settlement service." The plain language of RESPA, then, demands that there be a determination of which settlement services are provided in connection with each real estate settlement including such things as title searches, title examinations, the preparation of documents, property surveys, and other potential services defined at section 2602(3). It appears, therefore, that RESPA anticipates an inquiry into the services provided in order to determine whether a prohibited referral occurred in the first instance, and also to determine the amount of damages warranted, if any. This loan-specific analysis is required to determine civil liability as well as to measure damages under RESPA.

We reject the analysis in Culpepper, and while it remains the law in the Eleventh Circuit, we choose a different conclusion, giving due deference to HUD's interpretations of its regulations.

## III.   CONCLUSION

We accept the loan-specific liability test promulgated by HUD, which recognizes that YSPs may be used as a way to finance closing costs. Accordingly, a loan-specific analysis is required in determining whether the payment of a YSP is based upon services rendered or an illegal referral. We do not surmise that the payment of a YSP will pass muster in each instance, or even in this case. We further emphasize that our opinion today in no way prohibits individual plaintiffs from pursuing their valid claims under RESPA. As noted, Congress, in its wisdom, fosters the guarantee of legal representation under RESPA on an individual basis by allowing for attorneys fees and costs as part of the prescribed recovery. Our only conclusion today is that the determination must be made on a loan-by-loan basis. Class

certification being impracticable, the judgment of the district court is reversed.  We remand for further action consistent with this opinion.[10]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[10]We have been inundated with communications from counsel in this case, mostly submitted under the guise of court rule 28(j).  Many if not most of this myriad upon myriad of filings violate both the language and spirit of the rule.  Because of the importance of this matter to the parties and the residential mortgage industry, however, we have examined each submission and leave to another day the question of sanctions for this type of violation.