**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

DENISE P. EDWARDS, individually and on behalf of all others similarly situated,

<em>Plaintiff-Appellant</em>,

v.

THE FIRST AMERICAN CORPORATION; FIRST AMERICAN TITLE INSURANCE COMPANY,

<em>Defendants-Appellees</em>.

</td>
<td>

No. 13-55542

D.C. No.
2:07-cv-03796-SJO-FFM

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
March 3, 2015—Pasadena, California

Filed August 24, 2015

Before: Michael R. Murphy,[*] Ronald M. Gould,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge Gould

---

[*] The Honorable Michael R. Murphy, Senior Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY[**]

### Class Certification

The panel affirmed in part and vacated in part the district court's order denying class certification in a case in which Denise P. Edwards, seeking to represent a class of similarly-situated home buyers, alleges that First American Corporation and its wholly owned subsidiary First American Title Insurance Company, engaged in a national scheme of paying title agencies things of value in exchange for the title agencies' agreement to refer future title insurance business to First American, in violation of the Real Estate Settlement Procedures Act (RESPA).

The panel held that in determining the propriety of class certification, the district court erred in holding that the safe harbor in 12 U.S.C. § 2607(c)(2) requires Edwards to prove that First American overpaid for its ownership interests in each of the title agencies. The panel explained that the ownership interests purchased by First American are equity shares—not goods, services or facilities within the meaning of § 2607(c)(2). The panel also held that the district court abused its discretion in denying class certification on the ground that 12 U.S.C. § 2607(a) requires an individual inquiry, on each transaction, to determine whether First American's purchase prices of the ownership interests exceeded their fair market value. The panel held that cases involving illegal kickbacks in violation of § 2607(a) are not necessarily unfit for class adjudication.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Applying Fed. R. Civ. P. 23(b)(3), the panel held that issues relating to the alleged common scheme predominate over individual issues. The panel wrote that Edwards need only prove the existence of an exchange involving a referral agreement, which does not require inquiry into individual facts across all 38 captive title agencies, and that the proposed class members also share common questions of fact. The panel concluded that the alleged common scheme, if true, presents a significant aspect of First American's transactions that warrant class adjudication: Whether First American paid a thing of value to get its agreement for exclusive referrals. The panel therefore vacated the district court's denial of class certification in part as to these transactions that involved the common scheme presented to First American's board of directors.

The panel disagreed with the district court's holding that influences by third parties constitute individual issues that render class adjudication improper. The panel wrote that other sources of referral do not defeat the predominant common questions of fact, i.e., whether the title agencies have contractual obligations to refer their customers to First American.

The panel held that the district court erred in determining that individual inquiries are required in connection with twelve title agencies that are affiliated business arrangements and in connection with certain agencies that are majority-owned by First American. The panel agreed with the district court that First American's transactions with newly-formed title agencies do not raise common issues sufficient for class action adjudication, and affirmed the district court's denial of certification as to the newly-formed title agencies.

Remanding for further proceedings, the panel wrote that the remaining prerequisites of class certification, which the district court declined to address, are best addressed by the district court.

## COUNSEL

James W. Spertus (argued), Ezra D. Landes, Spertus, Landes & Umhofer, LLP, Los Angeles, California; Cyril V. Smith (argued), William K. Meyer, Zuckerman Spaeder LLP, Baltimore, Maryland; David A. Reiser, Zuckerman Spaeder LLP, Washington, D.C.; Richard S. Gordon, Martin E. Wolf, Gordon & Wolf, Chtd., Towson, Maryland, for Plaintiffs-Appellants.

Brian J. Murray (argued), Nathaniel P. Garrett, Leigh A. Krahenbuhl, Jones Day, Chicago, Illinois; Matthew A. Kairis, Jones Day, Columbus, Ohio, for Defendants-Appellees.

Nandan M. Joshi (argued), Senior Litigation Counsel, Meredith Fuchs, General Counsel, To-Quyen Truong, Deputy General Counsel, David M. Gossett, Assistant General Counsel, Consumer Financial Protection Bureau, Washington, D.C., for Amicus Curiae Consumer Financial Protection Bureau.

**OPINION**

GOULD, Circuit Judge:

We must decide whether the district court abused its discretion in denying Plaintiff Denise P. Edwards's motion for class certification, in her action against Defendants First American Corporation and its wholly owned subsidiary First American Title Insurance Company (collectively, "First American"). Edwards, seeking to represent a class of similarly-situated home buyers, alleged that First American engaged in a national scheme of paying the title agencies things of value in exchange for the title agencies' agreement to refer future title insurance business to First American, in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617. We affirm in part, vacate in part, and remand.

**I**

Edwards bought a home in Cleveland, Ohio. Edwards used Tower City Title Agency, LLC ("Tower City") as her settlement agent, and by referral of Tower City, she used First American as her title insurer. Prior to Edwards's home purchase, First American and Tower City entered into a transaction: First American acquired a 17.5% ownership interest in Tower City for $2 million and, in the same transaction, Tower City agreed to refer future title insurance business to First American. First American also entered into similar transactions with various other title agencies. In each of these transactions, First American paid the title agency a lump sum of money in exchange for (1) a minority ownership interest in the title agency and (2) the title agency's

agreement to refer future title insurance business to First American.

Edwards filed a putative class action against First American, alleging that the transactions between First American and the captive title agencies violated RESPA's anti-kickback provision, 12 U.S.C. § 2607. Edwards originally moved to certify a class of home buyers referred to First American by any of the 180 title agencies that First American partially owned. The district court declined to certify that class but ordered discovery to determine whether it should certify the Tower City class, consisting of all home buyers who were referred to First American by Tower City.

After completing discovery, Edwards moved to certify the Tower City class. The district court denied certification. We reversed and held that "there is a single, overwhelming common question of fact: whether the arrangement between Tower City and First American violated" RESPA. *Edwards v. The First Am. Corp.*, 385 F. App'x 629, 631 (9th Cir. 2010) ("*Edwards I*"). We ordered nationwide discovery on remand and gave Edwards an opportunity to renew her motion to certify a nationwide class. *Id.* After further discovery, Edwards moved to certify a nationwide class consisting of all home buyers who entered into a federally-related mortgage transaction using one of thirty-eight title agencies that sold a minority ownership interest to First American and, in the same transaction, agreed to refer future title insurance business to First American.

The district court again denied certification, now on the basis that common issues did not predominate over individual issues for the nationwide class. First, the district court concluded that individual inquiries were required to

determine whether First American overpaid for its ownership interests in each title agency. Second, the district court found that common issues did not predominate over individual issues of reliance and causation for referrals. Third, the district court concluded that transaction-specific inquiries as a result of the different types of title agencies will not require common proof related to First American's liability. Edwards appeals the district court's order denying class certification.

## II

We review the district court's determination of class certification for abuse of discretion and consider "whether the district court correctly selected and applied Rule 23's criteria." *Parra v. Bashas', Inc.*, 536 F.3d 975, 977 (9th Cir. 2008). The underlying legal questions, however, are reviewed *de novo*, and "any error of law on which a certification order rests is deemed a per se abuse of discretion." *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

## III

### A

Federal Rule of Civil Procedure 23 allows a representative to litigate on behalf of a class of similarly-situated individuals who are too numerous to join the litigation. The party seeking class certification bears the burden of establishing that the proposed class meets the requirements of Rule 23. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001). To be certified, a proposed

class must satisfy all requirements in Rule 23(a) and at least one of the requirements in Rule 23(b).  Rule 23(a) requires that plaintiffs demonstrate (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed. R. Civ. P. 23(a).  Rule 23(b) lists three alternative requirements for class certification, and where, as here, plaintiffs seek class certification under subsection (b)(3), they must demonstrate the superiority of maintaining a class action and show "that the questions of law or fact common to class members predominate over any questions affecting only individual members."    Fed. R. Civ. P. 23(b)(3); *see also Zinser*, 253 F.3d at 1189–92.

A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not "turn class certification into a mini-trial" on the merits. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011).  But Rule 23(a)(2) is not a pleading standard, so to the extent necessary, our determination of commonality will inevitably touch upon the merits of plaintiffs' underlying RESPA claims. *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013); *Wal-Mart Stores*, 131 S. Ct. at 2551; *Stockwell v. City & Cty. of S.F.*, 749 F.3d 1107, 1111–12 (9th Cir. 2014).

In 1974, Congress passed RESPA to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices."  12 U.S.C. § 2601(a).  One of the consumer-protection provisions is RESPA § 8, 12 U.S.C. § 2607, which furthers Congress's goal of "eliminat[ing] . . . kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." *Id.* § 2601(b)(2); *see also Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2038 (2012).  Paying kickbacks or referral fees to induce referrals

of title insurance underwriting is part of the serious problem Congress sought to remedy in RESPA. *See* S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551.

The national title insurance industry is highly concentrated, with most states dominated by two or three large title insurance companies. *See* U.S. Gov't Accountability Office, *Title Insurance: Actions Needed to Improve Oversight of the Title Industry and Better Protect Consumers* 3 (Apr. 2007). A "factor that raises questions about the existence of price competition is that title agents market to those from whom they get consumer referrals, and not to consumers themselves, creating potential conflicts of interest where the referrals could be made in the best interest of the referrer and not the consumer." *Id.* Kickbacks paid by the title insurance companies to those making referrals lead to higher costs of real estate settlement services, which are passed on to consumers without any corresponding benefits.

Section 8(a) of RESPA aims to eliminate these unlawful kickbacks. It prohibits any exchange of a thing of value pursuant to real estate referrals:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a). RESPA defines a "thing of value" broadly to include "any payment, advance, funds, loan, service, or other consideration." *Id.* § 2602(2). Courts

commonly find a violation of § 2607(a) when (1) a payment or thing of value was exchanged, (2) pursuant to an agreement to refer settlement business, and (3) there was an actual referral. *See Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 314 (2d Cir. 2012); *see also Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 427 (6th Cir. 2009); *Culpepper v. Irwin Mortg. Corp.*, 491 F.3d 1260, 1265 (11th Cir. 2007). Notwithstanding the general prohibition of exchanging any thing of value for a referral, a statutory safe harbor exempts a payment from RESPA violation if the payment—despite being made simultaneously with a referral—was "for goods or facilities actually furnished or for services actually performed." *See id.* § 2607(c)(2).

Congress gave the Department of Housing and Urban Development ("HUD") authority to regulate under RESPA, and HUD promulgated the corresponding regulations known as Regulation X. *See* Pub. L. No. 94-205 § 10, 89 Stat. 1157, 1159 (1976). The Dodd-Frank Wall Street Reform and Consumer Protection Act transferred the regulatory authority of RESPA from HUD to the Consumer Financial Protection Bureau ("CFPB"), and CFPB later republished Regulation X without material changes. *See* 76 Fed. Reg. 78,977 (Dec. 20, 2011); 12 C.F.R. § 1024.[1]

Under Regulation X, a "referral" includes "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service for which the home buyer will pay a charge"; and an exchange of a "thing of value" is used as synonymous with a payment and does not require a

---

[1] Because this case arose when HUD was the regulatory agency, citations to Regulation X will still be to 24 C.F.R. § 3500.

transfer of money.[2]    24 C.F.R. § 3500.14(d), (f)(1). Regulation X further explains the safe harbor in § 2607(c)(2). *See id.* § 3500.14(g)(2) ("If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided.").

## B

We first address whether individual inquiries on each of the transactions are required due to the safe harbor in § 2607(c)(2) and 24 C.F.R. § 3500.14(g)(2).   The district court held that the statute and the regulation require Edwards to prove that First American overpaid for its ownership interests in each of the title agencies, and these individual inquiries render class action improper.

CFPB submitted an amicus brief interpreting RESPA and its own Regulation X.  CFPB contends that § 2607(c)(2) does not apply to the transactions here because First American's payment for ownership interests is not a payment for goods, facilities, or services.  CFPB urges us to give deference to its interpretation.

As a threshold matter, we must consider the proper level of deference to be given to the agency interpretation.  Our analytical framework depends on whether the agency is interpreting the statute or the regulation.   An agency's interpretation of an ambiguous statute is entitled to *Chevron* deference when the interpretation is promulgated in the exercise of the agency's formal rule-making authority. *See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*,

---

[2] Here, we use the terms "thing of value" and payment interchangeably.

467 U.S. 837, 843 (1984). An agency's interpretation of its own ambiguous regulation is generally entitled to *Auer* deference. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own ambiguous regulation is controlling unless "plainly erroneous or inconsistent with the regulation") (internal citation omitted).

Here, CFPB is interpreting the statute, not the regulation. An agency's interpretation of the statute—when presented in an amicus brief—is not promulgated in the exercise of its formal rule-making authority, so no *Chevron* deference is warranted. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 826 (9th Cir. 2012) (en banc). Even if the terms "goods," "services," and "facilities" also appear in the regulation, *see* 24 C.F.R. § 3500.14(g)(1)(iv), CFPB is in fact interpreting Congress's words in the statute, so we give no deference to CFPB's interpretation. *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 210 (2011). In addition, because the statutory terms at issue are not ambiguous, no deference is merited. *See Chevron*, 467 U.S. at 842–43; *United States v. Able Time, Inc.*, 545 F.3d 824, 835–36 (9th Cir. 2008).

We nevertheless agree with CFPB's interpretation, which is consistent with the language of the statute. Neither RESPA nor Regulation X defines "goods," "facilities," or "services," *see* 12 U.S.C. § 2602; 24 C.F.R. § 3500.2, so we begin with the statutory text and "end[] there as well if the text is unambiguous." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). Here, the meanings of "goods," "facilities," and "services" are plain. "Goods" are "tangible movable personal property having intrinsic value excluding money"; a "facility" is "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or

established to perform some particular function or to serve or facilitate some particular end"; and "service" is "the performance of work commanded or paid for by another." *See Webster's Third New International Dictionary* (1993); *see also American Heritage Dictionary* (defining "goods" as "product that is bought and sold" or "portable personal property"; "facility" as "[a] building, room, array of equipment, or a number of such things, designed to serve a particular function"; and "service" as "[w]ork that is done for others as an occupation or business" or "[a]n act or a variety of work done for others, especially for pay").

The ownership interests purchased by First American are equity shares, not goods, services, or facilities. First American contends that two of the thirty-eight transactions at issue also contained acquisitions of facilities, such as a title plant[3] and buildings. This misses the point. The purchase of ownership interests—which are not goods, services, or facilities—disqualified First American's transactions from the exemption under § 2607(c)(2), regardless of whether the acquisitions may have also included facilities. We conclude that § 2607(c)(2) cannot apply to First American's transactions as a matter of law, so the district court erred in relying on § 2607(c)(2) to determine the propriety of class certification.

## C

We next address whether individual inquiries are required because of § 2607(a). The district court interpreted the "thing

---

[3] A title plant, according to First American, is "title records assembled and maintained for the purpose of issuing title insurance."

of value"[4] in § 2607(a), as applied to the transactions at issue, to be the amount that First American overpaid for its ownership interests in each of the captive title agencies. The district court relied on decisions of our circuit, as well as those of other circuits, to conclude that the determination of kickback amount requires individual comparisons between the payment and the services provided. *See, e.g.*, *Lane v. Residential Funding Corp.*, 323 F.3d 739, 745 (9th Cir. 2003); *Bjustrom v. Trust One Mortg. Corp.*, 322 F.3d 1201, 1208 (9th Cir. 2003); *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1014 (9th Cir. 2002); *see also Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 530 (7th Cir. 2012); *Glover v. Standard Fed. Bank*, 283 F.3d 953, 963–64 (8th Cir. 2002). As a result, it concluded that an individual inquiry on each transaction will be required to determine whether First American's purchase prices of the ownership interests exceeded their fair market value.

The cases relied on by the district court are inapplicable here, because they interpreted the statutory exemption under § 2607(c)(2), which we have concluded does not apply to First American's transactions. *See Lane*, 323 F.3d at 742;

---

[4] CFPB, in its amicus brief, offers its own interpretation of the phrase "thing of value" under Regulation X. 24 C.F.R. § 3500.14(d). As a general rule, an agency's interpretation of its own ambiguous regulation, even if presented in an amicus brief, is controlling unless "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (internal citation omitted). But no *Auer* deference is due when the regulation at issue is unambiguous. *See Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009). Here, the regulation's definition of a "thing of value" is unambiguous, *see* 24 C.F.R. § 3500.14(d), so we decline to give *Auer* deference and interpret the regulation in accordance with its plain meaning.

*Schuetz*, 292 F.3d 1012. Also, these cases adopted and applied HUD's two-prong test interpreting § 2607(c)(2): first, there must be actual performance of compensable services; and second, the total compensation must be reasonably related to the goods or services provided. *See, e.g.*, *Schuetz*, 292 F.3d at 1012 (explaining that the HUD two-part test reflects the statutory safe harbor in § 8(c)). But the two-prong HUD test is also inapplicable here, because no services were provided by the title agencies to First American. We hold that the district court abused its discretion in denying class certification based on an erroneous interpretation of § 2607(a), *Conn. Ret. Plans*, 660 F.3d at 1175, and that cases alleging illegal kickbacks in violation of § 2607(a) are not necessarily unfit for class adjudication.

But the question remains: Are there individual issues here that could predominate over common issues such that class action certification is inappropriate? *See* Fed. R. Civ. P. 23(b)(3). We hold that the answer to this question is no. RESPA does not—as the district court held—require Edwards to pinpoint how much money First American paid for the referral agreement as opposed to the equity interest. Rather, she can state a claim under RESPA § 8(a) by alleging that First American paid a lump sum of money to each captive title agency (the thing of value), and—in exchange for that money—each title agency agreed to refer First American future insurance (business agreement).

Absent § 8(c), nothing in the statute requires Edwards to prove First American gave money to the title agencies only in consideration for the referral agreement. The statute merely prohibits the exchange of a "thing of value" for a referral agreement. 12 U.S.C. § 2607(a). It and the regulation define "thing of value" broadly to include a wide variety of

considerations, and an exchange of a thing of value need not involve a transfer of money solely as a kickback. *See* 12 U.S.C. § 2602; 24 C.F.R. § 3500.14(d). Here, Edwards alleges that First American paid the title agency a lump sum of money; in return, First American obtained two items: the title agency's equity interest and the title agency's agreement to refer future title insurance business. Whether this transaction violates RESPA § 8(a) does not require inquiry into individual issues of payment.

This conclusion comports with our understanding of contract law. There is a "presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." *Am. Sav. Bank, F.A. v. United States*, 519 F.3d 1316, 1324 (Fed. Cir. 2008) (quoting *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992)). Although the contract terms were silent on how much of First American's monetary consideration was attributed to the referrals, the law does not require every term of the contract to have a separately stated consideration. *Sarnoff v. Am. Home Products Corp.*, 798 F.2d 1075, 1080 (7th Cir. 1986), *superseded on other grounds by Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 958 (7th Cir. 1998). The undivided monetary consideration paid by First American must be treated in law as consideration for both the equity interests and referrals. *See Restatement (Second) of Contracts* § 80, cmt. a (Am. Law Inst. 1981) ("A single performance or return promise may thus furnish consideration for any number of promises."); 3 *Williston on Contracts* § 7:51 (4th ed.) (discussing that one consideration may support several promises). An example clarifies: Assume that if one buys a bottle of water and a bottle of soda from a grocery store, and pays $5 in total, the payment is for both the water and the soda, and value is being

given for both. We decline to conclude that in this assumed case, value has been given for only one and not for the other. In other words, Edwards need only prove the existence of an exchange involving a referral agreement. Such proof does not require inquiry into individual facts across all thirty-eight captive title agencies.

Moving on to the commonality inquiry under Rule 23(a)(2),[5] we ask whether the proposed class members share a common question of law or fact, the answer to which "will resolve an issue that is central to the validity of each one of the [class members'] claims." *Wal-Mart*, 131 S. Ct. at 2551. We have previously held that there was an overwhelming common question of fact concerning the Tower City class. *Edwards I*, 385 F. App'x. at 631. There is also a common question of fact concerning some of the transactions here: whether First American's pattern of conducts in entering into similar transactions with the title agencies violates RESPA.[6]

The district court erred in concluding that the common issue does not predominate over individual issues for the proposed class members. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Common issues predominate over individual issues when the common issues "represent a significant aspect of the case and they can

---

[5] The district court did not address the commonality issue under Rule 23(a)(2) but seemed to have concluded that there was a common issue.

[6] We hold in Part V that First American's transactions with the newly-formed title agencies do not share common issues of fact with the transactions with the preexisting title agencies. *See infra* Part V.

be resolved for all members of the class in a single adjudication." 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1778 (3d ed. 1998). Here, Edwards contends that First American utilized a nationwide scheme of buying minority interests in the title agencies in order to secure remittance streams from the agencies' future referrals. Edwards points to evidence showing this common scheme, including several memoranda submitted to First American's board of directors asking for approval of these transactions (referred to by the parties as the "Smoking Gun Memos"). Some of these Smoking Gun Memos described First American's common strategy to purchase certain title agencies' minority interests to secure their exclusive agreement to provide future referrals, and other Smoking Gun Memos revealed that the primary motivation underlying these transactions was not to gain returns from the ownership interests but to lock up remittance streams from future referrals. For example, in the documentation for the purchase of a minority interest in Doral Title, LLC, First American presented to its board a justification reciting in part, "[b]uying a minority interest now will ensure that we capture the Company's u/w remittance streams." Similarly, in connection with purchase of a minority interest in Equity Land Title LLC, First American told its board that "the u/w remittance stream is the primary source of our economic returns for this investment." Pointing in the same direction, on purchase of minority share of Equity Title Insurance Agency, Inc., First American presented to its board that "[a]s a condition to closing the proposed transaction, [First American] and Equity will execute an exclusive agency agreement." Besides the Smoking Gun Memos, Edwards also points to the standard contract terms that First American imposed on the captive title agencies to prohibit the agencies

from issuing policies for First American's competitors, subject to limited exceptions.

We emphasize that at this stage of the litigation we are making no conclusions on whether the evidence cited above—including the Smoking Gun Memos and the alleged standard contract terms imposed by First American—resolves the merits of Edward's underlying RESPA claims. Our focus now is to decide whether the issues relating to the alleged common scheme predominate over individual issues for the proposed class, so that the case should be certified for class adjudication. *See Stockwell*, 749 F.3d at 1111–12 (holding that a common contention need not be one that will prevail on the merits) (internal citation and quotation omitted). We cite First American's alleged practices not as bearing on the merits but as bearing on First American's common scheme—as alleged in the complaint—that predominates over individual issues for certain class members. This common scheme, if true, presents a significant aspect of First American's transactions that warrant class adjudication: Whether First American paid a thing of value to get its agreement for exclusive referrals. We vacate the district court's denial of class certification in part as to these transactions that involved the common scheme presented to First American's board of directors.[7]

---

[7] We do not hold that common issues predominate over individual issues on claims of the entire proposed class relating to all thirty-eight title agencies. As explained in Part V, we affirm in part the denial of certification as to the newly-formed agencies. *See infra* Part V. As to the preexisting title agencies, we remand for the district court to decide in the first instance which of these title agencies' transactions with First American fit into the common scheme, including the transactions approved by First American's board of directors pursuant to the "Smoking Gun Memos."

**IV**

First American showed that on some occasions someone other than the captive title agencies—such as lenders, mortgage brokers, realtors, and other title agencies—affirmatively influenced the home buyers' choice of First American as their title insurance underwriter. The district court held that the third parties' influences constituted individual issues that render class adjudication improper. We disagree. Other sources of referral do not defeat the predominant common question of fact, i.e., whether the title agencies have contractual obligations to refer their customers to First American.

For a referral to violate RESPA, it need not be the exclusive or even the primary reason that influenced a home buyer's choice of a real estate service provider. *See* 24 C.F.R. § 3500.14(f)(1) (defining a referral as "any oral or written action directed to a person which has the effect of *affirmatively influencing* the selection" of a real estate service provider") (emphasis added); *see also* 12 U.S.C. § 2607(d)(2) (imposing joint and several liability on all of those who affirmatively influenced the selection of a title insurance provider). Here, Edwards contends that First American used standard, written contracts to impose an obligation on the captive title agencies to refer future title insurance business, subject to some limited exceptions. If this is true, the title agencies' contractual obligations affected the entire class of home buyers as a result of First American's standard terms. *See* Fed. R. Civ. P. 23(b)(3) advisory committee note ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action . . . ."). Even if other service providers may have also influenced the home buyers' decision to choose First

American, there remains a predominant, common question of whether the title agencies' contractual obligations affirmatively influenced the home buyer's choice of First American.

V

The district court denied certification on the additional ground that the different types of title agencies will require individual, case-by-case proof on First American's liability. First American contends that in the proposed class, there are three unique types of title agencies, so that separate inquiries on each type will be required.

First, First American contends that its transactions with twelve of the thirty-eight title agencies are affiliated business arrangements ("ABA") that are exempt from RESPA violations under § 2607(c)(4). An ABA exemption under § 2607(c)(4) permits a person who owns an interest in a settlement service provider to refer customers to the settlement service provider if (1) it disclosed the affiliated relationship; (2) it does not require the person referred to use any particular service provider; and (3) the only thing of value received from the arrangement is a return on the ownership interest. *See* 12 U.S.C. § 2607(c)(4). The district court concluded that class adjudication was improper because it had to take evidence to determine if each of the twelve agencies fits the ABA exemption.

When defendants opposing class certification raise a legal defense that may defeat commonality, the district court cannot assume its validity but should make a threshold determination on the legal merits. The district court need not take evidence to determine the legal merits of defendants'

defense, because otherwise it would defeat the purpose of class certification. But if an alleged defense is invalid as a matter of law, the defense will not give rise to individual issues and thus cannot be a valid basis for denying class certification.

First American's defense on the basis of § 2607(c)(4) is invalid as a matter of law. Section 2607(c)(4) exempts a transaction from a RESPA violation when a person who partially owns a settlement service provider refers business to the service provider, and the owner receives nothing other than a return of the service provider's shares. But here, First American—the partial owner of the title agencies—did not refer business to the title agencies. To the contrary, the service provider (i.e., the title agencies) referred business to the partial owner (i.e., First American). In addition, in these transactions, First American did not receive any payments from the title agencies as a return on its ownership interests. No individual inquiries on the twelve title agencies' ABA status will be required, because § 2607(c)(4) cannot apply to these transactions as a matter of law.

Second, First American contends that certain agencies are majority-owned by First American, and First American cannot refer business to itself. First American cites the Supreme Court's decision in *Freeman*, 132 S. Ct. at 2043–44, which held that to establish a violation of § 2607(b), a plaintiff must demonstrate that a charge for settlement services was divided between at least two persons. But *Freeman* is inapplicable here: First American and its majority-owned title agencies are not the same person, but separate legal entities. No separate inquiries are necessary merely because First American is the majority owner of certain captive title agencies.

Third, the district court concluded that First American's transactions with the newly-formed title agencies do not raise common issues sufficient for class action adjudication. We agree and affirm the district court's denial of certification as to the newly-formed title agencies. First American contends that twelve of the thirty-eight title agencies were not preexisting when First American decided to purchase their ownership interests. Instead, First American and third party investors formed and invested in these title agencies, and the investors' ownership interests were proportional to their capital investments.

Edwards alleges in the complaint that First American engaged in a nationwide scheme of securing referral agreements by offering to purchase ownership interests of various title agencies. However, First American's transactions with these newly-formed agencies represent a different set of facts from the nationwide scheme alleged in the complaint. We conclude that these transactions do not share common questions of fact between First American and the transactions with the preexisting title agencies and thus do not require common proof to resolve the validity of each of the class members' claims. *Wal-Mart*, 131 S. Ct. at 2551.

**VI**

Having concluded that common issues did not predominate over individual issues for the proposed class, the district court declined to address the remaining prerequisites of class certification, including whether a class action is a superior method of adjudication, whether Edwards and her counsel are adequate, and whether the putative class is ascertainable. Edwards urges us to consider these questions in the first instance on appeal and certify the proposed class.

We decline to do so. Although we have concluded that common issues predominate over individual issues for a sub class of home buyers referred by the title agencies that were subject to First American's common scheme, the remaining prerequisites of class certification are best addressed by the district court, which is "in the best position to consider the most fair and efficient procedure for conducting any given litigation." *Stockwell*, 749 F.3d at 1116–17 (internal citation omitted).

We affirm the district court's denial of class certification in part as to the newly-formed title agencies, vacate the district court's denial of class certification in part as to the remaining title agencies, and remand for further proceedings.

Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**